# EXHIBIT 1

Filed
07 August 17 P6:41
Margaret G. Montemayor
District Clerk
Bexar District

CAUSE NO. 2007CI 12493

| | | |
|---|---|---|
| CLEAR CHANNEL BROADCASTING, INC., CLEAR CHANNEL BROADCASTING LICENSES, INC., CC LICENSES, LLC, CAPSTAR RADIO OPERATING COMPANY, CAPSTAR TX LIMITED PARTNERSHIP, AMFM RADIO LICENSES, LLC, CITICASTERS CO., CITICASTERS LICENSES, L.P. AND JACOR BROADCASTING CORPORATION, | § § § § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| V. | § § | 288th _____ JUDICIAL DISTRICT |
| FREQUENCY, LLC (f/k/a GOODRADIO.TV, LLC), FREQUENCY LICENSE, LLC, (f/k/a GOODRADIO.TV LICENSE, LLC), AMERICAN SECURITIES CAPITAL PARTNERS, LLC AND JEFFREY D. WARSHAW | § § § § § § § § | BEXAR COUNTY, TEXAS |
| Defendants. | § § | |

---

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs Clear Channel Broadcasting, Inc., Clear Channel Broadcasting Licenses, Inc.,

CC Licenses, LLC, Capstar Radio Operating Company, Capstar TX Limited Partnership, AMFM

Radio Licenses, LLC, Citicasters Co, Citicasters Licenses, L.P. and Jacor Broadcasting

Corporation (collectively, "Plaintiffs") file this Original Petition for damages against Defendants

Frequency, LLC (f/k/a GoodRadio.TV, LLC), Frequency License, LLC (f/k/a GoodRadio. TV

License, LLC), American Securities Capital Partners, LLC and Jeffrey D. Warshaw.  In support

of their Original Petition, Plaintiffs show as follows:

## Discovery Control Plan

1.      Discovery in this case is intended to be conducted under Level 3 of the Texas Rules of Civil Procedure.

## Parties

2.      Plaintiff Clear Channel Broadcasting, Inc. ("Clear Channel") is a Nevada corporation, with its principal place of business at 200 East Basse Road, San Antonio, Bexar County, Texas 78209.

3.      Plaintiff Clear Channel Broadcasting, Licenses, Inc. is a Nevada corporation, with its principal place of business at 200 East Basse Road, San Antonio, Bexar County, Texas 78209.

4.      Plaintiff CC Licenses, LLC is a Delaware limited liability company, with its principal place of business at 200 East Basse Road, San Antonio, Bexar County, Texas 78209.

5.      Plaintiff Capstar Radio Operating Company is a Delaware corporation, with its principal place of business at 200 East Basse Road, San Antonio, Bexar County, Texas 78209.

6.      Plaintiff Capstar TX Limited Partnership is a Delaware limited partnership, with its principal place of business at 200 East Basse Road, San Antonio, Bexar County, Texas 78209.

7.      Plaintiff AMFM Radio Licenses, LLC is a Delaware limited liability company, with its principal place of business at 200 East Basse Road, San Antonio, Bexar County, Texas 78209.

8.      Plaintiff Citicasters Co. is an Ohio corporation, with its principal place of business at 200 East Basse Road, San Antonio, Bexar County, Texas 78209.

9.      Plaintiff Citicasters Licenses, L.P. is a Nevada limited partnership, with its principal place of business at 200 East Basse Road, San Antonio, Bexar County, Texas 78209.

2

10.    Plaintiff Jacor Broadcasting Corporation is an Ohio corporation, with its principal place of business at 200 East Basse Road, San Antonio, Bexar County, Texas 78209.

11.    Defendant Frequency, LLC, f/k/a GoodRadio.TV, LLC ("Frequency Parent"), is a Delaware limited liability company, with its principal place of business at Chrysler Center, 666 Third Avenue, 29th Floor, New York, New York 10017. Frequency may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because Frequency engages in business in Texas but does not maintain a regular place of business in this state or a designated agent for service of process, and this lawsuit arose from Frequency's business in Texas.

12.    Defendant Frequency License, LLC, f/k/a GoodRadio.TV License, LLC (individually "Frequency License" and collectively with Frequency Parent "Frequency"), is a Delaware limited liability company, with its principal place of business at Chrysler Center, 666 Third Avenue, 29th Floor, New York, New York 10017. Frequency License may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because Frequency License engages in business in Texas but does not maintain a regular place of business in this state or a designated agent for service of process, and this lawsuit arose from Frequency License's business in Texas.

13.    Defendant American Securities Capital Partners, LLC ("ASCP") is a Delaware limited liability company, with its principal place of business at Chrysler Center, 666 Third Avenue, 29th Floor, New York, New York 10017. ASCP may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701, as its agent for service because ASCP engages in business in Texas but does not maintain a regular place of business in

3

this state or a designated agent for service of process, and this lawsuit arose from ASCP's business in Texas.

14.    Defendant Jeffrey D Warshaw ("Jeff Warshaw" or "Mr. Warshaw"), an individual, is a nonresident of Texas, having his usual place of business at Connoisseur Media, LLC, 136 Main Street, Suite 202, Westport, Connecticut 06880.  Mr. Warshaw may be personally served with process at that address by a person authorized to serve process.

### Jurisdiction & Venue

15.    The court has jurisdiction over this lawsuit because the amount in controversy exceeds this court's minimum jurisdiction requirements.

16.    The court has jurisdiction over Frequency and ASCP, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.042(1) because Frequency and ASCP, nonresidents, purposefully availed themselves of the privileges and benefits of conducting business in Texas by engaging in business in Texas by entering into an Asset Purchase Agreement ("APA") on April 30, 2007 with Plaintiffs, some of whom are citizens of Texas. The contract was to be performed in part in Texas, and according to Section 11.8 of the APA, the construction and performance of the APA "shall be governed by the laws of the State of Texas."

17.    The court has jurisdiction over Jeff Warshaw because Mr. Warshaw purposefully availed himself of the privileges and benefits of conducting business in Texas by committing a tort, which is the subject of this suit, in whole or in part in Texas.

18.    Venue is appropriate in Bexar County, Texas pursuant to TEX. CIV. PRAC. & REM. CODE §15.002(a)(1) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this county.

4

## Factual Background

19.    On April 30, 2007, Frequency Parent entered into the APA with Plaintiffs to buy 187 radio stations in 36 markets. A copy of the APA is attached as Exhibit A. On May 11, 2007, Frequency Parent assigned and Frequency License assumed the APA with respect to the FCC licenses under the APA. A copy of the Assignment and Assumption Agreement is attached as Exhibit B.

20.    ASCP is a private equity investment firm that agreed to fund Frequency's financial obligations under the APA. On information and belief, ASCP formed Frequency, for the purpose of acquiring the radio stations, and ASCP either directly or indirectly manages and controls Frequency's day-to-day business activities. Glenn Kaufman, Frequency's Chief Executive Officer and President, is an ASCP Managing Director, and Paul S. Kasper, Frequency's Vice President, is a Principal of ASCP. Also, according to a report from the internet website "news.radio-online.com," Michael G. Fisch, a Managing Director and President of ASCP is reported to have "ultimate" control and ownership over Frequency. A copy of "*GoodRadio.TV Becomes Frequency License, Goodman Exits*" from news.radio-online.com, dated July 20, 2007, is attached as Exhibit C.

21.    During the four months before the APA was signed, as a part of the due diligence process, Plaintiffs allowed Frequency and ASCP to have full access to all business and financial information regarding the stations to be purchased, including but not limited to access to an online virtual data room, as well as the ability to request any other information. The information was provided subject to a Confidentiality Agreement executed on November 30, 2006 between DeanRadio.TV, Inc. and Clear Channel Communications, Inc., the terms of which were assumed by Frequency through the APA.

5

22.    Frequency and ASCP agreed to pay and represented that they could pay Plaintiffs the sum of $452,100,000 for the stations.  Plaintiffs relied upon these representations in entering into the APA.

23.    The transaction does not have a specific closing date because it requires a number of governmental consents.  For example, the Federal Communications Commission ("FCC") must consent to a transfer of the FCC licenses from Plaintiffs to Frequency.  However, the parties anticipated that the transaction would close in approximately mid to late October or November 2007.

24.    On July 19, 2007, Clear Channel CEO Mark Mays was contacted by Jeff Warshaw, CEO of Connoisseur Media, LLC.  Mr. Warshaw has been retained by ASCP and Frequency as a consultant in connection with the acquisition of the Clear Channel radio stations.  On information and belief, Mr. Warshaw is interested in managing the radio stations that Frequency and ASCP will acquire from Clear Channel under the APA.  A copy of a July 25, 2007 article printed from the internet website eriemediablog.com and entitled *"Is Connoisseur's Warshaw Making His Investors Nervous?"* is attached as Exhibit D.

25.    Mr. Warshaw told Mr. Mays that Frequency would not close under the parties' APA unless Plaintiffs agreed to reduce the purchase price from $450 million (actually $452.1) to $350 million.  Mr. Mays informed Mr. Warshaw that Plaintiffs expected Frequency to close the transaction as agreed.  In response, Mr. Warshaw said that his client would not close at the previously agreed upon price.

26.    On July 24, 2007, only five days after Mr. Warshaw's call, Glenn Kaufman, Frequency's CEO and President, sent a letter to Clear Channel.  The letter accused Clear Channel of being in breach and default of the APA.  However, none of the allegations in the

6

letter were substantiated by any facts. The letter appeared to be nothing more than a transparent attempt by Frequency to manipulate Plaintiffs into lowering the agreed upon purchase price for the radio stations, the relief Frequency did not receive as a result of Mr. Warshaw's call to Mr. Mays.

27.     On July 27, 2007, even though the allegations against it were unsubstantiated, Clear Channel responded to each of the matters raised in Frequency's letter. In addition, by its letter, Clear Channel asked Frequency to provide adequate assurance that Frequency intended to consummate the transaction on the terms set forth in the APA. Clear Channel viewed the statements by Mr. Warshaw and Frequency's July 24, 2007 letter collectively as a repudiation of Frequency's obligations under the APA. Consequently, Clear Channel's letter further stated that, if Frequency did not provide the requisite assurance within twenty (20) days from receipt of Clear Channel's letter, Clear Channel would pursue all contractual and legal remedies available to it, including but not limited to termination of the APA and recovery of the $20.3 million in liquidated damages pursuant to Sections 1.6 and 10.5 of the APA.

28.     On July 31, 2007, Frequency responded to Clear Channel's letter. In its response, Frequency attempted to justify the actions of Mr. Warshaw, and it continued to accuse Clear Channel of unsubstantiated breaches of the APA despite Clear Channel's July 27th response to those baseless allegations. In response to Clear Channel's request for assurance from Frequency that Frequency intended to consummate the transaction on the agreed upon terms, Frequency gave no such assurance in its July 31st letter. In fact, it threatened litigation if different terms related to the value of the radio stations were not reached. Frequency's refusal to consummate the transaction on the terms contained in the APA, as well Frequency's failure to give adequate assurance of its intention to consummate the transaction, constitute a breach of the APA.

29.    As a result of Frequency's breach of the APA, Plaintiffs have suffered and will continue to suffer financial harm and have lost the benefits expected to be received from the contract if Frequency had performed as promised. Plaintiffs' damages exceed the jurisdictional limits of this Court.

## Conditions Precedent

30.    Plaintiffs have performed all obligations to date but will be prevented from closing the transaction in accordance with the APA because Frequency wrongfully refused to perform by refusing to pay the purchase price agreed upon in the APA and by failing to give Plaintiffs adequate assurance that it would consummate the transaction on the terms contained in the APA. However, all conditions precedent to bringing this lawsuit have been performed or have occurred.

## Count I –Breach of Contract

31.    Plaintiffs adopt and incorporate the foregoing Paragraphs 19 through 30 as if they were fully set out herein.

32.    To date, Plaintiffs have fully performed all their obligations under the APA and are ready, willing and able to proceed to closure of the transaction.

33.    Frequency has breached the APA (1) by stating that it will not close the transaction unless the purchase price for the stations is lowered and (2) by failing and refusing to give Plaintiffs adequate assurance that Frequency intends to consummate the purchase of the radio stations on all the terms set forth in the parties' APA.

34.    Frequency is without any justification in its actions, and the foregoing breach by it of the contractual obligations owed to Plaintiffs is the proximate cause of Plaintiffs' damages.

## Count II – Fraud and Fraudulent Misrepresentation

35.     Plaintiffs adopt and incorporate the foregoing Paragraphs 19 through 34 as if they were fully set out herein.

36.     ASCP and Frequency induced Plaintiffs to enter into the APA by promising to pay Plaintiffs $452.1 million for the radio stations being acquired.  Frequency and ASCP misrepresented their ability and agreement to pay the purchase price as evidenced by their current refusal and unwillingness to pay the agreed upon purchase price and to abide by the terms of the APA.

37.     The representations by ASCP and Frequency were false statements of material facts and also constituted false promises of future performance.  Plaintiffs would not have entered into the APA had they known that ASCP and Frequency could not pay and had no intention of paying the agreed upon purchase price.

38.     ASCP and Frequency knowingly and/or recklessly made the false representations with the intent that Plaintiffs would rely upon them.

39.     Plaintiffs relied upon the representations from ASCP and Frequency in entering into the APA, and Plaintiffs were injured as a result of their reliance on the misrepresentations and subsequent acts of ASCP and Frequency.

40.     Accordingly, Plaintiffs request that the Court award them actual and exemplary damages by reason of the fraud committed by ASCP and Frequency.

## Count III – Tortious Interference with Prospective Business Relations

41.     Plaintiffs adopt and incorporate the foregoing Paragraphs 19 through 40 as if they were fully set out herein.

9

42.    Plaintiffs established an auction to sell radio stations.  The auction included dozens of bidders.  Radio stations in 54 markets were available at the time the APA was signed.  By misrepresenting their ability and willingness to buy the stations at the agreed price, ASCP and Frequency induced Clear Channel to take 36 of the 54 markets out of the auction and end dealings with other bidders.

43.    ASCP and Frequency knew that other bidders were attempting to acquire the radio stations, and they intentionally interfered with Clear Channel's prospective business relations with those other bidders by inducing Clear Channel, through misrepresentations, to end its dealings with other bidders.  That interference deprived Clear Channel of the benefits of the auction and the ability to enter into other purchase agreements.

44.    Plaintiffs have suffered actual damage and loss because the interference by ASCP and Frequency prevented Plaintiffs from entering into purchase agreements with others bidders in the auction context.

45.    The interference by ASCP and Frequency proximately caused injury to Plaintiffs, which resulted in damages to Plaintiffs including but not limited to the loss of the sale of its radio stations.  Plaintiffs seek actual damages resulting from the conduct of ASCP and Frequency that exceeds the jurisdictional limits of this court.

46.    Plaintiffs' injury resulted from malice or actual fraud by ASCP and Frequency, which entitles Plaintiffs to exemplary damages under TEX. CIV. PRAC. & REM. CODE §41.003(a).

### Count IV – Tortious Interference with Existing Contract by ASCP

47.    Plaintiffs adopt and incorporate the foregoing Paragraphs 19 through 46 as if they were fully set out herein.

48.    Plaintiffs had a valid contract with Frequency.

49.    ASCP knew or had reason to know of Plaintiffs' contract with Frequency and Plaintiffs' interest in that contract.

50.    ASCP willfully and intentionally interfered with the contract between Plaintiffs' and Frequency by inducing Frequency to breach the contract and hindering performance of the APA.

51.    The interference on the part of ASCP proximately caused injury to Plaintiffs, which has resulted in Plaintiffs incurring actual damages.

52.    Plaintiffs' injury resulted from malice or actual fraud by ASCP, which entitles Plaintiffs to exemplary damages under TEX. CIV. PRAC. & REM. CODE §41.003(a).

### Count V – Tortious Interference with Existing Contract by Jeff Warshaw

53.    Plaintiffs adopt and incorporate the foregoing Paragraphs 19 through 52 as if they were fully set out herein.

54.    Plaintiffs had a valid contract with Frequency.

55.    Jeff Warshaw knew or had reason to know of Plaintiffs' contract with Frequency and Plaintiffs' interest in that contract.

56.    Mr. Warshaw willfully and intentionally interfered with the contract between Plaintiffs' and Frequency by inducing Frequency to breach the contract and hindering performance of the APA.

57.    The interference on the part of Mr. Warshaw proximately caused injury to Plaintiffs, which has resulted in Plaintiffs incurring actual damages.

58.    Plaintiffs' injury resulted from malice or actual fraud by Mr. Warshaw, which entitles Plaintiffs to exemplary damages under TEX. CIV. PRAC. & REM. CODE §41.003(a).

11

### Attorney's Fees

59.     Plaintiffs have been compelled to employ the undersigned attorneys to represent them in this action and to recover the damages they have suffered at the hands of Frequency. Plaintiffs have incurred, and will continue to incur reasonable and necessary attorney's fees in prosecuting their claims against Frequency and are entitled to recover from Frequency all such fees pursuant to TEX. CIV. PRAC. & REM. CODE §38.002.

### Jury Demand

60.     Plaintiffs demand a jury trial and tender the appropriate fee with this petition.

### Request for Disclosure

61.     Under Texas Rule of Civil Procedure 194, Plaintiffs request that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

### Prayer for Relief

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon trial, Plaintiffs be granted judgment against Defendants for actual and liquidated damages, exemplary damages, reasonable and necessary attorneys fees and court costs, pre-judgment interest, post-judgment interest, and all other relief to which they may be justly entitled.

12

AKIN GUMP STRAUSS HAUER & FELD L.L.P.
300 Convent Street, Suite 1600
San Antonio, Texas 78205
Telephone: 210.281.7000
Fax: 210.224.2035

CRT
PROCESS DEPT.

*R. Laurence Macon*

R. LAURENCE MACON
State Bar No. 12787500
lmacon@akingump.com

ATTORNEY FOR PLAINTIFFS
CLEAR CHANNEL BROADCASTING, INC.,
CLEAR CHANNEL BROADCASTING
LICENSES, INC., CC LICENSES, LLC,
CAPSTAR RADIO OPERATING COMPANY,
CAPSTAR TX LIMITED PARTNERSHIP,
AMFM RADIO LICENSES, LLC
CITICASTERS CO.
CITICASTERS LICENSES, L.P.
JACOR BROADCASTING CORPORATION

13

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of the date set forth below among the company or companies set forth as Seller on the signature page hereto (collectively, "Seller") and the company or companies set forth as Buyer on the signature page hereto (collectively, "Buyer").

### Recitals

A.    Seller owns and operates the radio broadcast stations that are described on *Exhibit A* hereto (each a "Station" and collectively with the WSRW-FM Included Assets, the WTRZ-FM Included Assets and the WMRN-FM Included Assets all described below, the "Stations") pursuant to certain authorizations issued by the Federal Communications Commission (the "FCC").

B.    Seller also owns and operates radio broadcast station WSRW-FM, Hillsboro, Ohio ("WSRW-FM"). Seller has filed or will file applications to change the WSRW-FM community of license, and effective upon such change, the station's call letters. The FCC authorizations for WSRW-FM and the WSRW-FM equipment set forth on *Schedule 1.2* are referred to herein collectively as the "WSRW-FM Excluded Assets." The other assets used or held for use in the operation of WSRW-FM, except for Excluded Assets (defined below) and subject to Section 1.3, are referred to herein as the "WSRW-FM Included Assets."

C.    Seller also owns and operates radio broadcast station WTRZ-FM, McMinnville, Tennessee ("WTRZ-FM"). Seller has filed or will file applications to change the WTRZ-FM community of license, and effective upon such change, the station's call letters. The FCC authorizations for WTRZ-FM and the WTRZ-FM equipment set forth on *Schedule 1.2* are referred to herein collectively as the "WTRZ-FM Excluded Assets." The other assets used or held for use in the operation of WTRZ-FM, except for Excluded Assets and subject to Section 1.3, are referred to herein as the "WTRZ-FM Included Assets."

D.    Seller also owns and operates radio broadcast station WMRN-FM, Marion, Ohio ("WMRN-FM"). Seller has filed or will file applications to change the WMRN-FM community of license, and effective upon such change, the station's call letters. The FCC authorizations for WMRN-FM and the WMRN-FM equipment set forth on *Schedule 1.2* are referred to herein collectively as the "WMRN-FM Excluded Assets." The other assets used or held for use in the operation of WMRN-FM, except for Excluded Assets and subject to Section 1.3, are referred to herein as the "WMRN-FM Included Assets."

E.    Pursuant to the terms and subject to the conditions set forth in this Agreement, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Station Assets (defined below).

### Agreement

NOW, THEREFORE, taking the foregoing into account, and in consideration of the mutual covenants and agreements set forth herein, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1:  PURCHASE OF ASSETS

1.1    Station Assets.  On the terms and subject to the conditions hereof, at Closing (defined below), except as set forth in Sections 1.2 and 1.3, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase and acquire from Seller, all right, title and interest of Seller in and to all assets and properties of Seller, real and personal, tangible and intangible, that are used or held for use in the operation of the Stations (the "Station Assets"), including without limitation the following:

(a)    all licenses, permits and other authorizations issued to Seller by the FCC with respect to the Stations (the "FCC Licenses"), including those described on *Schedule 1.1(a)*, including any renewals or modifications thereof between the date hereof and Closing;

(b)    all of Seller's equipment, transmitters, antennas, cables, towers, vehicles, furniture, fixtures, spare parts and other tangible personal property of every kind and description that are used or held for use in the operation of the Stations, including without limitation those listed on *Schedule 1.1(b)*, except for any retirements or dispositions thereof made between the date hereof and Closing in the ordinary course of business (the "Tangible Personal Property");

(c)    all of Seller's real property used or held for use in the operation of the Stations (including any appurtenant easements and improvements located thereon), including without limitation those listed on *Schedule 1.1(c)* (the "Real Property");

(d)    all agreements for the sale of advertising time on the Stations entered into in the ordinary course of business, and all other contracts, agreements and leases entered into in the ordinary course of the Stations' business, including without limitation those listed on *Schedule 1.1(d)*, together with all contracts, agreements and leases made between the date hereof and Closing in accordance with Article 4 (the "Station Contracts");

(e)    all of Seller's rights in and to the Stations' call letters and Seller's rights in and to the trademarks, trade names, service marks, internet domain names, copyrights, programs and programming material, jingles, slogans, logos, and other intangible property which are used or held for use in the operation of the Stations, including without limitation those listed on *Schedule 1.1(e)* (the "Intangible Property"); and

(f)    Seller's rights in and to all the files, documents, records, and books of account (or copies thereof) relating to the operation of the Stations, including the Stations' local public files, programming information and studies, engineering data, advertising studies, marketing and demographic data, sales correspondence, lists of advertisers, credit and sales reports, and logs, but excluding records relating to Excluded Assets.

The Station Assets shall be transferred to Buyer free and clear of liens, claims and encumbrances ("Liens") except for Assumed Obligations (defined in Section 1.4), liens for taxes not yet due and payable, liens that will be released at or prior to Closing, and, with respect to the Real Property, such other easements, rights of way, building and use restrictions and other exceptions that do not in any material respect detract from the value of the property subject thereto or impair the use thereof in the ordinary course of the business of the Stations (collectively, "Permitted Liens").

- 2 -

1.2    Excluded Assets. Notwithstanding anything to the contrary contained herein, the Station Assets shall not include the following assets or any rights, title and interest therein (the "Excluded Assets"):

(a)    all cash and cash equivalents of Seller, including without limitation certificates of deposit, commercial paper, treasury bills, marketable securities, money market accounts and all such similar accounts or investments;

(b)    all tangible and intangible personal property of Seller retired or disposed of between the date of this Agreement and Closing in accordance with Article 4;

(c)    all Station Contracts that are terminated or expire prior to Closing in accordance with Article 4;

(d)    Seller's corporate and trade names unrelated to the operation of the Stations (including the name "Clear Channel"), charter documents, and books and records relating to the organization, existence or ownership of Seller, duplicate copies of the records of the Stations, and all records not relating to the operation of the Stations;

(e)    all contracts of insurance, all coverages and proceeds thereunder and all rights in connection therewith, including without limitation rights arising from any refunds due with respect to insurance premium payments to the extent related to such insurance policies;

(f)    all pension, profit sharing plans and trusts and the assets thereof and any other employee benefit plan or arrangement and the assets thereof, if any, maintained by Seller;

(g)    all compensation arrangements which provide employees, former employees, officers, directors and shareholders of Seller or any affiliate of Seller, any compensation or other benefits, including any bonus or incentive plan, stock rights plan, deferred compensation arrangement, life insurance, stock purchase plan, severance pay plan and any other employee fringe benefit plan, except for any such compensation arrangements that are expressly included in the Assumed Obligations;

(h)    the Stations' accounts receivable and any other rights to payment of cash consideration for goods or services sold or provided prior to the Effective Time (defined below) or otherwise arising during or attributable to any period prior to the Effective Time (the "A/R");

(i)    any non-transferable shrinkwrapped computer software and any other non-transferable computer licenses that are not material to the operation of the Stations;

(j)    all rights and claims of Seller, whether mature, contingent or otherwise, against third parties with respect to the Stations and the Station Assets, to the extent arising during or attributable to any period prior to the Effective Time;

(k)    all deposits and prepaid expenses (and rights arising therefrom or related thereto), except to the extent Seller receives a credit therefor under Section 1.7;

(l)    computers and other similar assets located in accordance with past practice anywhere other than at the studios, offices and transmitter sites of the Stations,

- 3 -

(m)    any operating systems that are used in the operation of multiple markets or other business units (the foregoing is not intended to exclude computers and other similar assets located in accordance with past practice at the studios, offices and transmitter sites of the Stations);

(n)    all studio, tower and other assets used or held for use in the operation of any other radio or television station owned or operated by Seller or an affiliate of Seller, provided that any of the same that are located in the Stations' markets are not used or held for use in the operation of any of the Stations;

(o)    any shares of stock in Broadcast Music, Inc. held by Seller;

(p)    certain contracts or portions thereof as provided by *Schedule 1.1(c)* or *Schedule 1.1(d)*;

(q)    the WSRW-FM Excluded Assets, the WTRZ-FM Excluded Assets and the WMRN-FM Excluded Assets; and

(r)    the assets listed on *Schedule 1.2* (if any).

If any real property is identified on *Schedule 1.2* as an Excluded Asset, then all towers and buildings on such property and any income-producing leases with respect thereto are also Excluded Assets. With respect to any such real property, if a lease providing for use of such property by the applicable Station does not currently exist, then either (i) prior to Closing Seller will enter into such a lease in the form of *Exhibit B* attached hereto (in which event it shall become a Station Contract) or (ii) if it does not enter into such lease prior to Closing, then at Closing, Buyer and Seller shall enter into such lease in such form.

With respect to any marks or similar Intangible Property used in the operation of the Stations that are used in whole or in part in the operation of any other station, the Station Assets include only the right to use such items in the manner used by Seller at the applicable Station on a basis exclusive in the market but non-exclusive in that no right is granted to Buyer with respect to other markets (some of which may overlap), and such right (i) is limited to the extent of Seller's transferable rights, (ii) may not be assigned by Buyer except to a transferee of the applicable Station who assumes Buyer's obligations in respect thereof (and any such assignment shall not relieve Buyer of any obligation or liability), (iii) may be used by Buyer only in a manner that does not diminish the quality of such items, and only without violating law or any third party rights (and Buyer shall be solely responsible for such use and the related services), and (iv) shall terminate for noncompliance or non-use, but otherwise shall be coterminous with Seller's rights. If any party requests further documentation of such rights, then upon Closing the parties shall enter into a separate license agreement that provides such rights in accordance with this Agreement.

1.3    Shared Contracts.

(a)    Some of the Station Contracts may be used in the operation of multiple stations or other business units (the "Shared Contracts"). Except as provided by *Schedule 1.1(d)*, the rights and obligations under the Shared Contracts shall be equitably allocated among stations

- 4 -

and such other business units in a manner reasonably determined by Seller in accordance with the following equitable allocation principles:

          (i)     any allocation set forth in the Shared Contract shall control;

          (ii)    if none, then any allocation previously made by Seller in the ordinary course of Station operations shall control;

          (iii)   if none, then the quantifiable proportionate benefit to be received by the parties after Closing shall control; and

          (iv)   if not quantifiable, then reasonable accommodation shall control.

        (b)     Buyer shall cooperate with Seller (and any third party designated by Seller) in such allocation, and the Station Contracts (and Assumed Obligations (defined below)) will include only Buyer's allocated portion of the rights and obligations under the Shared Contracts (without need for further action and whether such allocation occurs before or after Closing). If designated by Seller, such allocation will occur by termination of the Shared Contract and execution of new contracts. If any Shared Contract includes any group discounts or similar benefits that are not assignable to Buyer, then Buyer's allocated portion of such Shared Contract will not include such terms. Completion of documentation of any such allocation is not a condition to Closing.

        1.4    Assumption of Obligations. On the Closing Date (defined below), Buyer shall enter into any new contracts required by *Schedule 1.1(c) or Schedule 1.1(d)* or otherwise required by this Agreement and shall assume the obligations of Seller attributable to any period of time on or after the Closing Date under the Station Contracts, the obligations described in Section 5.7(c) and any other liabilities of Seller to the extent Buyer receives a credit therefor under Section 1.7 (collectively, the "Assumed Obligations"). Except for the Assumed Obligations, Buyer does not assume, and will not be deemed by the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby to have assumed, any other liabilities or obligations of Seller (the "Retained Obligations").

        1.5    Purchase Price. In consideration for the sale of the Station Assets to Buyer, at Closing Buyer shall pay Seller, by wire transfer of immediately available funds, the sum of Four Hundred Fifty-Two Million One Hundred Thousand Dollars ($452,100,000), subject to adjustment pursuant to Section 1.7 (the "Purchase Price").

        1.6    Deposit. On the date of this Agreement, Buyer shall make a cash deposit in immediately available funds in an amount equal to four and one-half percent (4.5%) of the Purchase Price (the "Deposit") with Bank of America (the "Escrow Agent") pursuant to the Escrow Agreement (the "Escrow Agreement") of even date herewith among Buyer, Seller and the Escrow Agent. At Closing, the Deposit shall be disbursed to Seller and applied to the Purchase Price and any interest accrued thereon shall be disbursed to Buyer. If this Agreement is terminated by Seller pursuant to Section 10.1(c), the Deposit and any interest accrued thereon shall be disbursed to Seller, subject to the terms of Section 10.5. If this Agreement is terminated for any other reason, the Deposit and any interest accrued thereon shall be disbursed to Buyer. The parties shall each instruct the Escrow Agent to disburse the Deposit and all interest thereon to the party entitled thereto and shall not, by any act or omission, delay or prevent any such

- 5 -

disbursement. Any failure by Buyer to make the Deposit on the date hereof constitutes a material default as to which the Cure Period under Section 10.1 does not apply entitling Seller to immediately terminate this Agreement.

      1.7     Prorations and Adjustments. All prepaid and deferred income and expenses relating to the Station Assets and arising from the operation of the Stations shall be prorated between Buyer and Seller in accordance with generally accepted accounting principles ("GAAP") as of 12:01 a.m. on the day of Closing (the "Effective Time"). Such prorations shall include without limitation all ad valorem, real estate and other property taxes (except transfer taxes as provided by Section 11.1), annual FCC regulatory fees, music and other license fees, utility expenses, rent and other amounts under Station Contracts and similar prepaid and deferred items. Seller shall receive a credit for all of the Stations' deposits and prepaid expenses that are included in the Station Assets. Prorations and adjustments shall be made no later than ninety (90) calendar days after Closing, with each party having documentation regarding the basis for or amount and payment status of any proration or adjustment providing, upon reasonable request, the other party with a copy of such reasonable documentation. Prorations and adjustments shall be subject to the following:

          (i)     Sales commissions related to the sale of advertisements broadcast on the Stations prior to Closing shall be the responsibility of Seller, and sales commissions related to the sale of advertisements broadcast on the Stations after Closing shall be the responsibility of Buyer.

          (ii)     With respect to trade, barter or similar agreements for the sale of time for goods or services assumed by Buyer, if at Closing the Stations have an aggregate negative barter balance (*i.e.*, the amount by which the value of air time to be provided by the Stations after Closing exceeds the fair market value of corresponding goods and services), there shall be no proration or adjustment, provided, however that with respect to each market, if the Stations in such market have an aggregate negative barter balance in excess of $75,000, then such excess shall be treated as prepaid time sales of Seller, and adjusted for as a proration in Buyer's favor. In determining barter balances under trade, barter or similar agreements assumed by Buyer at Closing, the value of air time shall be based upon Seller's rates as of Closing, and corresponding goods and services shall include those to be received by the Stations after Closing *plus* those received by the Stations before Closing, to the extent conveyed by Seller to Buyer as part of the Station Assets (but only to the extent included in the barter balances as maintained in Seller's books and records in accordance with past practice).

          (iii)     The prorations shall include an adjustment for employee leave (if any) accrued in the calendar year in which Closing occurs and in any prior calendar year with respect to each Transferred Employee (defined below). Seller shall be responsible for as a Retained Obligation any liability for accrued unused employee leave for any employee who is not a Transferred Employee.

          (iv)     Seller shall be entitled to all revenue and pay or discharge all expenses, obligations and liabilities relating to the Excluded Assets both prior to and after Closing.

      1.8     Allocation. Within 120 days of Closing, Seller shall allocate the Purchase Price for tax purposes in accordance with the respective fair market values of the Station Assets

-6-

and the goodwill being purchased and sold in accordance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"), and provide Buyer with a copy of such allocation. Each of Buyer and Seller shall file a tax return in accordance with and when required under the Code.

       1.9    Closing. The consummation of the sale and purchase of the Station Assets provided for in this Agreement (the "Closing") shall take place on or before the tenth business day after the date of the last to occur of the date the FCC Consent becomes a Final Order (defined below), HSR Clearance (defined below), or on such other day after such FCC Consent and HSR Clearance as Buyer and Seller may mutually agree, subject to Section 5.7(b) and the satisfaction or waiver of the conditions set forth in Articles 6 and 7 below. The date on which the Closing is to occur is referred to herein as the "Closing Date." "Final Order" means that action shall have been taken by the FCC (including action duly taken by the FCC's staff, pursuant to delegated authority) which shall not have been reversed, stayed, enjoined, set aside, annulled or suspended; with respect to which no timely request for stay, petition for rehearing, appeal or certiorari or *sua sponte* action of the FCC with comparable effect shall be pending; and as to which the time for filing any such request, petition, appeal, certiorari or for the taking of any such *sua sponte* action by the FCC shall have expired or otherwise terminated.

       1.10    Governmental Consents.

       (a)    Within ten (10) business days of the date of this Agreement, Buyer and Seller shall file an application with the FCC (the "FCC Application") requesting FCC consent to the assignment of the FCC Licenses to Buyer. FCC consent to the FCC Application and to the Trust Application (defined below), each without any material adverse conditions other than as contemplated by Section 1.11 and other than those of general applicability is referred to herein as the "FCC Consent". Buyer and Seller shall diligently prosecute the FCC Application and otherwise use their commercially reasonable efforts to obtain the FCC Consent as soon as possible; provided, however, except as provided in the following sentence, neither Buyer nor Seller shall be required to pay consideration to any third party to obtain FCC Consent. Buyer and Seller shall each pay one-half of the FCC filing fees relating to the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated. Buyer and Seller each shall oppose any petitions to deny or other objections filed with respect to the FCC Application to the extent such petition or objection relates to such party. Subject to Section 1.10(d) and the other terms of this Agreement, neither Buyer nor Seller shall take any intentional action that would, or intentionally fail to take such action the failure of which to take would, reasonably be expected to have the effect of materially delaying the receipt of the FCC Consent. If the Closing shall not have occurred for any reason within the original effective period of the FCC Consent, subject to Section 10.1, Buyer and Seller shall jointly request an extension of the effective period of the FCC Consent. No extension of the FCC Consent shall limit the right of either party to exercise its rights under Section 10.1.

       (b)    If applicable, within fifteen (15) business days after the date of this Agreement, Buyer and Seller shall make any required filings with the Federal Trade Commission and the United States Department of Justice pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") with respect to the transactions contemplated hereby (including a request for early termination of the waiting period thereunder), and shall thereafter promptly respond to all requests received from such agencies for additional

- 7 -

information or documentation.  Expiration or termination of any applicable waiting period under the HSR Act is referred to herein as "HSR Clearance."

       (c)      Buyer and Seller shall notify each other of all documents filed with or received from any governmental agency with respect to this Agreement or the transactions contemplated hereby.  Buyer and Seller shall furnish each other with such information and assistance as the other may reasonably request in connection with their preparation of any governmental filing hereunder.  The FCC Consent and HSR Clearance are referred to herein collectively as the "Governmental Consents".

       (d)      In connection with any merger agreement or other strategic transaction involving Seller's parent entity, notwithstanding anything to the contrary set forth in this Agreement, if Seller notifies Buyer at any time prior to Closing, whether before or after the Governmental Consents are obtained, that it is necessary to specify a new transferor or otherwise change the FCC Application or any filing under the HSR Act, the parties shall amend, withdraw and re-file, or otherwise modify the FCC Application and any filing under the HSR Act, when requested by Seller to make such change, whether minor or major.

       (e)      If any Stations are located in a market in which Seller's ownership of stations is grandfathered under the FCC media ownership rules, then, in connection with any merger agreement or other strategic transaction involving Seller's parent entity, notwithstanding anything to the contrary set forth in this Agreement, Seller may, but is not obligated to, assign this Agreement and convey all or any part of the Station Assets to a divestiture trust pursuant to which the trustee assumes this Agreement, either in whole or in part, as to such assets.

       (f)      The main station FCC Licenses expire on the dates set forth on *Schedule 1.1(a)*.  In order to avoid disruption or delay in the processing of the FCC Application, if applicable, Buyer agrees, as a part of the FCC Application, to request that the FCC apply its policy permitting the assignment of FCC Licenses in transactions involving multiple stations to proceed, notwithstanding the pendency of one or more renewal applications.  Buyer agrees to make such customary representations and undertakings as are necessary or appropriate to invoke such policy, including without limitation undertakings to assume the position of the applicant with respect to any pending renewal applications and to assume the risks relating to such renewal applications.  To the extent reasonably necessary to expedite grant of a renewal application and thereby facilitate grant of the FCC Application, Seller shall enter into customary tolling agreements with the FCC to extend the statute of limitations for the FCC to determine or impose a forfeiture penalty against a Station in connection with any pending complaints that such Station aired programming that contained obscene, indecent or profane material or in connection with any other enforcement matters against a Station with respect to which the FCC may permit Seller to enter into a tolling agreement.

     1.11    Designated Markets.  Seller has identified to Buyer certain markets in which Seller's ownership of Stations is grandfathered under the FCC media ownership rules.  Under such rules, in such markets, Buyer is not eligible to acquire intact the entire group of Stations.  Accordingly, notwithstanding anything in this Agreement to the contrary:

       (i)      simultaneously with the filing of the FCC Application, Buyer shall file with the FCC a trust application (the "Trust Application"), or if the Trust (defined below) has not

been formed at the time the FCC Application is filed, then the Trust Application shall be filed within ten (10) business days after the date the FCC Application is filed;

(ii)     the Trust Application shall request consent to assign to a trust (the "Trust") such Stations (the "Trust Stations") as are necessary to enable Buyer to consummate the Closing hereunder in compliance with the FCC media ownership rules;

(iii)     the Trust shall include, and the Trust Application shall identify, a FCC-qualified trustee (the "Trustee"), a FCC-approved form of trust agreement under which the Trustee will sell the Trust Stations to FCC-qualified, independent third-party buyers and operate the Trust Stations until sale, and other terms consistent with divestiture trusts previously approved by the FCC in multi-market radio transactions;

(iv)     consummation of Closing under this Agreement shall be subject to prior FCC consent to the Trust Application; and

(v)     simultaneously with Closing, Buyer shall transfer the Trust Stations to the Trust.

Buyer shall diligently prosecute the Trust Application and otherwise use commercially reasonable efforts to obtain FCC consent thereto as soon as possible. Buyer shall oppose any petitions to deny or other objections filed with respect to the Trust Application. Buyer shall not take any action that would, or fail to take such action the failure of which to take would, reasonably be expected to have the effect of materially delaying the receipt of FCC consent thereto. If Closing does not occur for any reason within the original effective period of FCC consent thereto, then, subject to Section 10.1, Buyer shall request an extension of the effective period of such consent. Subject to Seller's prior written consent, which shall not be unreasonably withheld, Buyer may request FCC consent to add other stations to the Trust, so long as any such request does not delay FCC consent to the FCC Application or the Trust Application or otherwise conflict with this Agreement.

ARTICLE 2:     SELLER REPRESENTATIONS AND WARRANTIES

Seller makes the following representations and warranties to Buyer:

2.1     Organization. Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and is qualified to do business in each jurisdiction in which the Station Assets are located. Seller has the requisite power and authority to execute, deliver and perform this Agreement and all of the other agreements and instruments to be made by Seller pursuant hereto (collectively, the "Seller Ancillary Agreements") and to consummate the transactions contemplated hereby.

2.2     Authorization. The execution, delivery and performance of this Agreement and the Seller Ancillary Agreements by Seller have been duly authorized and approved by all necessary action of Seller and do not require any further authorization or consent of Seller. This Agreement is, and each Seller Ancillary Agreement when made by Seller and the other parties thereto will be, a legal, valid and binding agreement of Seller enforceable in accordance with its terms, except in each case as such enforceability may be limited by bankruptcy, moratorium,

- 9 -

insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

      2.3    No Conflicts. Except as set forth on *Schedule 2.3* and except for the Governmental Consents and consents to assign certain of the Station Contracts, the execution, delivery and performance by Seller of this Agreement and the Seller Ancillary Agreements and the consummation by Seller of any of the transactions contemplated hereby does not conflict with any organizational documents of Seller, any contract or agreement to which Seller is a party or by which it is bound, or any law, judgment, order, or decree to which Seller is subject, or require the consent or approval of, or a filing by Seller with, any governmental or regulatory authority or any third party.

      2.4    FCC Licenses. Except as set forth on *Schedule 1.1(a)*:

      Seller is the holder of the FCC Licenses described on *Schedule 1.1(a)*, which are all of the licenses, permits and authorizations required for the present operation of the Stations, other than the WSRW-FM Excluded Assets, the WTRZ-FM Excluded Assets and the WMRN-FM Excluded Assets (none of which shall be conveyed to Buyer). The FCC Licenses are in full force and effect and have not been revoked, suspended, canceled, rescinded or terminated and have not expired. The FCC Licenses are not subject to any conditions other than those applicable to radio broadcast licenses generally or as otherwise disclosed on the face of the FCC Licenses. There is not pending, or, to Seller's knowledge, threatened, any action by or before the FCC to revoke, suspend, cancel, rescind or materially adversely modify any of the FCC Licenses (other than proceedings to amend FCC rules of general applicability). There is not issued or outstanding, or, to Seller's knowledge, threatened, by or before the FCC, any order to show cause, notice of violation, notice of apparent liability, or order of forfeiture against the Stations or against Seller with respect to the Stations that could result in any such action. Each Station is operating in compliance in all material respects with the FCC Licenses, the Communications Act of 1934, as amended (the "Communications Act"), and the rules, regulations and policies of the FCC. All material reports and filings required to be filed with the FCC by Seller with respect to the Stations have been timely filed. All such reports and filings are accurate and complete in all material respects. To Seller's knowledge, there are no facts or circumstances relating to the FCC qualifications of Seller that (i) could reasonably be expected to prevent or delay the FCC from granting the FCC Application or (ii) would otherwise disqualify Seller as the licensee of the Stations.

      2.5    Taxes. Seller has, in respect of the Stations' business, filed all foreign, federal, state, county and local income, excise, property, sales, use, franchise and other tax returns and reports which are required to have been filed by it under applicable law, and has paid all taxes which have become due pursuant to such returns or pursuant to any assessments which have become payable.

      2.6    Personal Property. *Schedule 1.1(b)* contains a list of material items of Tangible Personal Property included in the Station Assets. Except as set forth on *Schedule 1.1(b)*, Seller has good and marketable title to the Tangible Personal Property free and clear of Liens other than Permitted Liens. Except as set forth on *Schedule 1.1(b)*, all items of equipment used or held for

- 10 -

use in the broadcast operations of the Stations and all other material items of Tangible Personal Property are in good operating condition, ordinary wear and tear excepted.

2.7    Real Property.  *Schedule 1.1(c)* contains a description of the Real Property.  Seller has good and marketable fee simple title to the owned Real Property described on *Schedule 1.1(c)* (the "Owned Real Property") (if any), free and clear of Liens other than Permitted Liens. *Schedule 1.1(c)* includes a description of each lease of Real Property or similar agreement included in the Station Contracts (the "Real Property Leases").  To Seller's knowledge, the Real Property is not subject to any suit for condemnation or other taking by any public authority.

2.8    Contracts.  *Schedule 1.1(d)* contains a list of all contracts that are used in the operation of the Stations other than contracts that when combined with any Station Contracts executed after the date of this Agreement do not exceed the limitations set forth in Section 4.1 and agreements for the sale of advertising time entered into in the ordinary course of business. The Station Contracts requiring the consent of a third party to assignment are identified with an asterisk on *Schedule 1.1(c)* and *Schedule 1.1(d)*.  Each of the Station Contracts (including without limitation each of the Real Property Leases) is in effect and is binding upon Seller and, to Seller's knowledge, the other parties thereto (subject to bankruptcy, insolvency, reorganization or other similar laws relating to or affecting the enforcement of creditors' rights generally). Seller has performed its obligations under each of the Station Contracts in all material respects, and is not in material default thereunder, and to Seller's knowledge, no other party to any of the Station Contracts is in default thereunder in any material respect.

2.9    Environmental.  Except as set forth on *Schedule 1.1(c)* or in any environmental report delivered by Seller to Buyer prior to the date of this Agreement, no hazardous or toxic substance or waste regulated under any applicable environmental, health or safety law has been generated, stored, transported or released on, in, from or to the Real Property included in the Station Assets by Seller, or, to Seller's knowledge, by any other party.  Except as set forth on *Schedule 1.1(c)* or in any environmental report delivered by Seller to Buyer prior to the date of this Agreement, Seller has complied in all material respects with all environmental, health and safety laws applicable to the Stations and the Real Property included in the Station Assets.

2.10    Intangible Property.  *Schedule 1.1(e)* contains a description of the material Intangible Property included in the Station Assets.  Except as set forth on *Schedule 1.1(e)*, (i) to Seller's knowledge, Seller's use of the Intangible Property does not infringe upon any third party rights in any material respect, (ii) no material Intangible Property is the subject of any pending, or, to Seller's knowledge, threatened legal proceedings claiming infringement or unauthorized use, and (iii) Seller has not received any written notice that its use of any material Intangible Property is unauthorized or infringes upon the rights of any other person.  Except as set forth on *Schedule 1.1(e)*, to Seller's knowledge, Seller owns or has the right to use the Intangible Property free and clear of Liens other than Permitted Liens.

2.11    Employees.  Except as set forth on *Schedule 2.11*, (i) Seller has complied in all material respects with all labor and employment laws, rules and regulations applicable to the Stations' business, including without limitation those which relate to prices, wages, hours, discrimination in employment and collective bargaining, (ii) there is no unfair labor practice charge or complaint against Seller in respect of the Stations' business pending or, to Seller's knowledge, threatened before the National Labor Relations Board, any state labor relations board

- 11 -

or any court or tribunal, and there is no strike, dispute, request for representation, slowdown or stoppage pending or threatened in respect of the Stations business, and (iii) Seller is not party to any collective bargaining, union or similar agreement with respect to the employees of Seller at the Stations, and to Seller's knowledge, no union represents or claims to represent or is attempting to organize such employees.

2.12    Insurance.  Seller maintains insurance policies or other arrangements with respect to the Stations and the Station Assets consistent with its practices for other stations, and will maintain such policies or arrangements until the Effective Time.

2.13    Compliance with Law.  Except as set forth on *Schedule 2.13*, (i) Seller has complied in all material respects with all laws, rules and regulations, including without limitation all FCC and Federal Aviation Administration rules and regulations applicable to the operation of the Stations, and all decrees and orders of any court or governmental authority which are applicable to the operation of the Stations, and (ii) to Seller's knowledge, there are no governmental claims or investigations pending or threatened against Seller in respect of the Stations except those affecting the industry generally.

2.14    Litigation.  Except as set forth on *Schedule 2.14*, there is no action, suit or proceeding pending or, to Seller's knowledge, threatened against Seller in respect of the Stations that will subject Buyer to liability or which will affect Seller's ability to perform its obligations under this Agreement.  Seller is not operating under or subject to any order, writ, injunction or decree relating to the Stations or the Station Assets of any court or governmental authority which would have a material adverse effect on the condition of the Stations or any of the Station Assets or on the ability of Seller to enter into this Agreement or consummate the transactions contemplated hereby, other than those of general applicability.

2.15    Financial Statements.  Seller has provided to Buyer copies of its statements of operations for the Stations for the years ended December 31, 2004, December 31, 2005 and December 31, 2006 and for the year to date through March 31, 2007.  Such year-end statements are the statements included in the audited consolidated financial statements of Seller and its affiliates (but such statements are not separately audited and the year to date statements are not audited).  Shared operating expenses and revenue from combined sales are allocated among the Stations and other stations and business units as determined by Seller.  Except for the foregoing and except for the absence of footnotes, such statements have been prepared in accordance with GAAP consistently applied and in the aggregate present fairly in all material respects the results of operations of the Stations as operated by Seller for the respective periods covered thereby.  Between March 31, 2007 and the date of this Agreement, the Stations have been operated in all material respects in the ordinary course of business consistent with the terms of Section 4.1 other than Sections 4.1 (e), (f) and (g).

2.16    No Undisclosed Liabilities.  There are no liabilities or obligations of Seller with respect to the Stations that will be binding upon Buyer after the Effective Time other than the Assumed Obligations and other than pursuant to the prorations under Section 1.7.

2.17    Station Assets.  The Station Assets include all assets that are owned or leased by Seller and used or held for use in the operation of the Stations in all material respects as currently operated, except for the Excluded Assets.

- 12 -

ARTICLE 3:  <u>BUYER REPRESENTATIONS AND WARRANTIES</u>

Buyer hereby makes the following representations and warranties to Seller:

3.1  <u>Organization</u>.  Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and is qualified to do business in each jurisdiction in which the Station Assets are located.  Buyer has the requisite power and authority to execute, deliver and perform this Agreement and all of the other agreements and instruments to be executed and delivered by Buyer pursuant hereto (collectively, the "<u>Buyer Ancillary Agreements</u>") and to consummate the transactions contemplated hereby.

3.2  <u>Authorization</u>.  The execution, delivery and performance of this Agreement and the Buyer Ancillary Agreements by Buyer have been duly authorized and approved by all necessary action of Buyer and do not require any further authorization or consent of Buyer.  This Agreement is, and each Buyer Ancillary Agreement when made by Buyer and the other parties thereto will be, a legal, valid and binding agreement of Buyer enforceable in accordance with its terms, except in each case as such enforceability may be limited by bankruptcy, moratorium, insolvency, reorganization or other similar laws affecting or limiting the enforcement of creditors' rights generally and except as such enforceability is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

3.3  <u>No Conflicts</u>.  Except for the Governmental Consents, the execution, delivery and performance by Buyer of this Agreement and the Buyer Ancillary Agreements and the consummation by Buyer of any of the transactions contemplated hereby does not conflict with any organizational documents of Buyer, any contract or agreement to which Buyer is a party or is by which it is bound, or any law, judgment, order or decree to which Buyer is subject, or require the consent or approval of, or a filing by Buyer with, any governmental or regulatory authority or any third party.

3.4  <u>Litigation</u>.  There is no action, suit or proceeding pending or, to Buyer's knowledge, threatened against Buyer which questions the legality or propriety of the transactions contemplated by this Agreement or could materially adversely affect the ability of Buyer to perform its obligations hereunder.

3.5  <u>Qualification</u>.  Subject to Section 1.11, (i) Buyer is legally, financially and otherwise qualified to be the licensee of, acquire, own and operate the Stations under the Communications Act and the rules, regulations and policies of the FCC, (ii) to Buyer's knowledge, there are no facts relating to Buyer that would, under existing law and the existing rules, regulations, policies and procedures of the FCC, disqualify Buyer as an assignee of the FCC Licenses or as the owner and operator of the Stations, (iii) no waiver of or exemption from any FCC rule or policy is necessary for the FCC Consent to be obtained, and (iv) to Buyer's knowledge, there are no matters relating to Buyer which might reasonably be expected to result in the FCC's denial or delay of approval of the FCC Application.

ARTICLE 4:  <u>SELLER COVENANTS</u>

- 13 -

4.1    Seller's Covenants.  Between the date hereof and Closing, except as permitted by this Agreement or with the prior written consent of Buyer, which shall not be unreasonably withheld, delayed or conditioned, Seller shall:

(a)    operate the Stations in the ordinary course of business consistent with past practice and in all material respects in accordance with FCC rules and regulations and with all other applicable laws, regulations, rules and orders;

(b)    not materially adversely modify, and in all material respects maintain in full force and effect, the FCC Licenses;

(c)    except as provided by Section 1.10(d), not other than in the ordinary course of business, sell, lease or dispose of or agree to sell, lease or dispose of any of the Station Assets unless replaced with similar items of substantially equal or greater value and utility, or create, assume or permit to exist any Liens upon the Station Assets, except for Permitted Liens, and not dissolve, liquidate, merge or consolidate with any other entity;

(d)    maintain the Tangible Personal Property in the ordinary course of business;

(e)    upon reasonable notice, give Buyer and its Representatives (as defined in the NDA (defined below)) and Credentialed Buyers (as defined in Section 5.1) reasonable access during normal business hours to the Station Assets, furnish Buyer with information relating to the Station Assets that Buyer may reasonably request, provided that such access rights shall not be exercised in a manner that interferes with the operation of the Stations, and, upon Buyer's reasonable request, furnish Buyer with monthly statements of operations in respect of the Stations in the form generated by Seller in the ordinary course of business;

(f)    provide prompt written notice to Buyer regarding any negotiations by Seller of any union agreements with respect to the Stations that if entered into by Seller prior to Closing will be binding upon Buyer after Closing; and except in the ordinary course of business and as otherwise required by law, not (i) enter into any employment, labor, or union agreement or plan (or amendments of any such existing agreements or plan) that will be binding upon Buyer after Closing or (ii) increase the compensation payable to any employee of the Stations, except for bonuses and other compensation payable by Seller in connection with the consummation of the transactions contemplated by this Agreement (if any); and

(g)    not enter into new Station Contracts that will be binding upon Buyer after Closing or amend any existing Station Contracts, except for permitted renewals as provided below and except for (A) new time sales agreements and other Station Contracts made in the ordinary course of business consistent with past practice that are terminable on ninety days notice or less without penalty, (B) other Station Contracts made with Buyer's prior consent, (C) those described on *Schedule 4.1*, and (D) other Station Contracts that do not require post-Closing payments by Buyer of more than $50,000 per Station, but not more than $4,500,000 in the aggregate for all such new contracts.

Seller may renew existing Station Contracts in the ordinary course of business without Buyer's consent unless (i) any renewal term is longer than the prior term of such Station Contract or (ii) any rate or fee increase is more than the lesser of any applicable market or

industry standards or 5% more than the then-existing rate or fee under such Station Contract, in which event such renewal shall be deemed a new Station Contract.

          For purposes of calculating the amount of said post-Closing payments by Buyer, if a contract is terminable by giving advance notice, then such amount shall include only the post-Closing amount that would be payable if a termination notice were given at Closing (whether or not such notice is in fact given), but in no event shall such amount be more than the amount payable absent such termination notice.

        4.2    Information. Subject to the NDA and the confidentiality provisions of Section 5.1, and provided that it does not violate any confidentiality agreement, (i) so long as it does not materially interfere with normal business operations, prior to Closing Seller will provide all information reasonably requested by Buyer relating to the Stations in connection with Buyer obtaining the financing it will require in order to consummate the transactions contemplated by this Agreement, obtaining such financing being the sole responsibility of Buyer, and (ii) Buyer may use such information as reasonably necessary to prepare on a confidential basis its prospectus, offering memorandum or similar document or marketing material, and may provide such information on a confidential basis to its prospective lenders, underwriters and their respective agents solely for purposes of the transactions contemplated by this Agreement. Buyer shall reimburse Seller for any out-of-pocket costs of third party providers associated with providing such information in connection with Buyer obtaining such financing.

## ARTICLE 5:  JOINT COVENANTS

        Buyer and Seller hereby covenant and agree as follows:

        5.1    Confidentiality. Seller or an affiliate of Seller and Buyer or an affiliate of Buyer are parties to a nondisclosure agreement (the "NDA") with respect to Seller and its stations. To the extent not already a direct party thereto, Buyer and Seller hereby assume the NDA and agree to be bound by the provisions thereof. Without limiting the terms of the NDA, subject to the requirements of applicable law, all non-public information regarding the parties and their business and properties that is disclosed in connection with the negotiation, preparation or performance of this Agreement (including without limitation all financial information provided by Seller to Buyer) shall be confidential and shall not be disclosed to any other person or entity, except the parties' representatives and lenders for the purpose of consummating the transaction contemplated by this Agreement. Buyer may disclose confidential information with respect to the applicable Stations to the Trustee and subject to Seller's prior written consent, which shall not be unreasonably withheld, to any potential third party buyer, provided, however that prior to disclosure to the Trustee and each such third party buyer shall have entered into a nondisclosure agreement on the same terms as the NDA for the benefit of Seller. Any such approved third party buyer who is party to such an agreement is referred to herein as a "Credentialed Buyer."

        5.2    Announcements. Prior to Closing, no party shall, without the prior written consent of the other, issue any press release or make any other public announcement concerning the transactions contemplated by this Agreement, except to the extent that such party is so obligated by law, in which case such party shall give advance notice to the other, and except that the parties shall cooperate to make a mutually agreeable announcement.

- 15 -

5.3    Control.  Buyer shall not, directly or indirectly, control, supervise or direct the operation of the Stations prior to Closing.  Consistent with the Communications Act and the FCC rules and regulations, control, supervision and direction of the operation of the Stations prior to Closing shall remain the responsibility of Seller as the holder of the FCC Licenses.

5.4    Risk of Loss.

(a)    Seller shall bear the risk of any loss of or damage to any of the Station Assets at all times until the Effective Time, and Buyer shall bear the risk of any such loss or damage thereafter.

(b)    If prior to the Effective Time any item of Tangible Personal Property is damaged or destroyed or otherwise not in the condition described in Section 2.6 in any material respect, then:

(i)    Seller shall use commercially reasonable efforts to repair or replace such item in all material respects in the ordinary course of business; and

(ii)    if such repair or replacement is not completed prior to Closing, then the parties shall proceed to Closing (with Seller's representations and warranties deemed modified to take into account any such condition) and Seller shall promptly repair or replace such item in all material respects after Closing (and Buyer will provide Seller access and any other reasonable assistance requested by Seller with respect to such obligation), except that if such damage or destruction materially disrupts Station operations, then Buyer may postpone Closing until the date five (5) business days after operations are restored in all material respects, subject to Section 10.1.

(c)    If prior to Closing a Station is off the air or operating at a power level that results in a material reduction in coverage (a "Broadcast Interruption"), then Seller shall use commercially reasonable efforts to return the Station to the air and restore prior coverage as promptly as possible in the ordinary course of business.  Notwithstanding anything herein to the contrary, if prior to Closing there is a Broadcast Interruption in excess of 24 hours, then Buyer may postpone Closing until the date five (5) business days after the Station returns to the air and prior coverage is restored in all material respects, subject to Section 10.1.

5.5    Environmental.

(a)    With respect to any Owned Real Property or ground lease included in the Station Assets, Buyer may at its expense conduct Phase I environmental assessments (each a "Phase I") prior to Closing, provided that such assessments are conducted during normal business hours upon reasonable prior notice (and subject to landlord consent if necessary), but completion of such assessments (or the results thereof) is not a condition to Closing.  If the written results of any Phase I recommend further investigation or testing or identify a recognized environmental condition that may require further investigation or testing, Buyer may, at its expense conduct a Phase II environmental assessment (each a "Phase II") prior to Closing, provided that such assessments are conducted during normal business hours upon reasonable prior notice (and subject to landlord consent if necessary), but completion of such assessments (or the results thereof) is not a condition to Closing.

- 16 -

(b)    If any Phase I, Phase II or any item set forth on *Schedule 1.1(c)* or any environmental report provided by Seller to Buyer prior to the date of this Agreement identifies a condition requiring remediation under, applicable environmental law, then:

(i)    except as set forth below, Seller shall use commercially reasonable efforts to remediate such condition in material compliance with environmental law in the ordinary course of business; and

(ii)    if such remediation is not completed prior to Closing, then the parties shall proceed to Closing (with Seller's representations and warranties deemed modified to take into account any such condition unless Seller shall have had knowledge of such condition on the date of this Agreement and failed to disclose such condition to Buyer as an exception to Seller's representations and warranties in Section 2.9 hereof) and Seller shall, at its expense, remediate such item after Closing in material compliance with environmental law (and Buyer will provide Seller access and any other reasonable assistance requested by Seller with respect to such obligation).

(c)    Notwithstanding anything herein to the contrary, if at any time any such condition exists and the reasonably estimated cost to remedy all such conditions in the aggregate exceeds the amount set forth on *Schedule 5.5*, then either party shall have the right to terminate this Agreement upon written notice to the other party; provided, however, that if Seller shall elect to terminate by written notice to Buyer, Buyer shall have the right, exercisable within ten (10) business days of the date of termination, to cancel such termination by giving written notice to Seller that Buyer accepts the obligation to remediate such conditions after Closing and releases Seller from all representations, obligations and liability with respect thereto in excess of the amount set forth on *Schedule 5.5*.

5.6    <u>Consents</u>.

(a)    The parties shall use commercially reasonable efforts to obtain (i) any third party consents necessary for the assignment of any Station Contract, including Station Contracts with affiliates, and (ii) execution of reasonable estoppel certificates by lessors under any Real Property Leases requiring consent to assignment (if any), but no such consents or estoppel certificates are conditions to Closing except for the Required Consents. Receipt of consent to assign to Buyer the Stations' main tower leases and main studio leases designated with a diamond on *Schedule 1.1(c)* is a condition precedent to Buyer's obligation to close under this Agreement (the "<u>Required Consents</u>"). Except as set forth on *Schedule 1.1(d)* or in any Station Contract, Buyer shall not be required to accept any material adverse change in the terms or conditions of any Station Contract to which such consent relates from those in effect on the date of this Agreement. Neither Seller nor Buyer shall be required to make any payments to any third party which is a party to any Station Contract in order to obtain its consent, except that any administrative or application fees customarily payable to such third party, or other fees or amounts expressly required by the terms of the Station Contract therewith, in connection with requests for consents shall be paid one-half by Buyer and one-half by Seller.

(b)    To the extent that any Station Contract may not be assigned without the consent of any third party, and such consent is not obtained prior to Closing, this Agreement and any assignment executed pursuant to this Agreement shall not constitute an assignment of such

- 17 -

Station Contract; provided, however, with respect to each such Station Contract, Seller and Buyer shall cooperate to the extent feasible in effecting a lawful and commercially reasonable arrangement under which Buyer shall receive the benefits under the Station Contract from and after Closing, and to the extent of the benefits received, Buyer shall pay and perform Seller's obligations arising under the Station Contract from and after Closing in accordance with its terms.

     5.7    Employees.

     (a)    Seller has provided Buyer a list showing employee positions and basic compensation for employees of the Stations. Except as set forth on *Schedule 1.1(d)*, Buyer may, but is not obligated to, offer post-Closing employment to such employees. With respect to each such employee, within sixty (60) calendar days after the date of this Agreement Buyer shall notify Seller in writing whether or not it will offer Comparable Employment (defined below) to such employee upon Closing. Within thirty (30) calendar days after Closing, Buyer shall give Seller written notice identifying (i) all Transferred Employees and (ii) all individuals who were employed by Seller prior to the Closing who were offered Comparable Employment with Buyer who did not accept such offers. As used herein, "Comparable Employment" means employment with no reduction in base salary or change in the amount of scheduled hours, and no requirement to commute more than 30 miles further than the employee's commute while employed by Seller.

     (b)    If applicable, Seller shall give any notice to any applicable employees required under the Worker Adjustment and Retraining Notification Act (the "WARN Act") or any similar state or local law, and Buyer shall comply with any applicable requirements thereunder after the Effective Time. If the WARN Act or any such other law is applicable, then Seller may by written notice to Buyer extend the Closing Date to a date within five (5) business days after expiration of all applicable notice periods.

     (c)    With respect to employees of the Stations hired by Buyer ("Transferred Employees"), Seller shall be responsible for all compensation and benefits arising prior to the Effective Time (in accordance with Seller's employment terms), and Buyer shall be responsible for all compensation and benefits arising after the Effective Time (in accordance with Buyer's employment terms). Buyer shall grant credit to each Transferred Employee for all unused vacation and sick leave accrued as an employee of Seller as of the Effective Time, and Buyer shall assume and discharge Seller's obligation to provide such leave to such Transferred Employees (such obligations being a part of the Assumed Obligations). Buyer shall receive an appropriate adjustment with respect to such leave as provided by Section 1.7. Seller shall provide promptly following Closing appropriate documentation of each Transferred Employee's accrued and unused vacation and sick leave as of Closing.

     (d)    Effective as of Closing, Buyer shall offer each Transferred Employee (and his or her eligible dependents) coverage under its "employee welfare benefit plans" (including without limitation health insurance plans) and "employee pension benefit plans" (as defined in ERISA) in which similarly situated employees are generally eligible to participate, including a group health plan that provides "health benefits" (within the meaning of Section 5000(b)(1) of the Internal Revenue Code) (but only to the extent permitted under the applicable plans of Buyer). Such group health plan shall: (i) have no limitation for pre-existing conditions (to the extent no such pre-existing condition limitations applied under the group health plan in

which the Transferred Employee (and his or her eligible dependents) participated immediately prior to the Closing), and (ii) for the year during which Closing occurs, provide such Transferred Employee full credit for any deductible already incurred by the Transferred Employee (and his or her dependents) under Seller's comparable group health plan and with any other out-of-pocket expenses that count against any maximum out-of-pocket expense provision of such group health plan (provided that Seller provides appropriate documentation from Seller's group health plans to confirm the amount of such deductibles and out-of-pocket expenses paid since the beginning of the calendar year and such documentation is provided within sixty (60) business days after the Closing Date). Buyer's vacation and sick leave policies shall provide each Transferred Employee with credit for years of service with Seller prior to Closing, to the same extent Seller credited such service prior to Closing, for the purpose of eligibility and entitlement for sick and vacation leave.

(e)    Buyer shall also permit each Transferred Employee who participates in Seller's 401(k) plan to elect to make direct rollovers of their account balances into Buyer's 401(k) plan (if any) as soon as administratively feasible after Closing, including the direct rollover of any outstanding loan balances such that they will continue to make payments under the terms of such loans under Buyer's 401(k) plan (if any), subject to compliance with applicable law and subject to the reasonable requirements of Buyer's 401(k) plan (if any).

5.8    Accounts Receivable. For a period of ninety (90) days after Closing (the "Collection Period"), Buyer shall, without charge to Seller, use commercially reasonable efforts to collect the A/R in the ordinary course of business and shall apply all amounts collected from the Stations' account debtors to the account designated or identifiable with respect to the amount collected and if not identifiable, to the oldest account not more than ninety (90) days past due. Any amounts relating to the A/R that are paid directly to Seller shall be retained by Seller, and Seller shall coordinate with Buyer to ensure that the appropriate account debtors are credited with such payments in the reports prepared by Buyer to show A/R collections. Buyer shall not discount, adjust or otherwise compromise any A/R and Buyer shall refer any disputed A/R to Seller. Within ten calendar days after the end of each month, Buyer shall deliver to Seller a report showing A/R collections for the prior month and Buyer shall make a payment, without offset, to Seller equal to the amount of all such collections (excluding the amount, if any, of A/R paid directly to Seller). At the end of the Collection Period, any remaining A/R shall be returned to Seller for collection.

5.9    1031 Exchange. To facilitate a like-kind exchange under Section 1031 of the Code, Seller may assign its rights under this Agreement (in whole or in part) to a "qualified intermediary" under section 1.1031(k)-1(g)(4) of the treasury regulations (but such assignment shall not relieve Seller of its obligations under this Agreement) and any such qualified intermediary may re-assign to Seller. If Seller gives notice of such assignment, Buyer shall provide Seller with a written acknowledgment of such notice prior to Closing and pay the Purchase Price (or such portion thereof as is designated in writing by the qualified intermediary) to or on behalf of the qualified intermediary at Closing and otherwise reasonably cooperate therewith.

5.10    Actions. After Closing, Buyer shall cooperate with Seller in the investigation, defense or prosecution of any action which is pending or threatened against Seller or its affiliates with respect to the Stations, whether or not any party has notified the other of a claim for

- 19 -

indemnification with respect to such matter. Without limiting the generality of the foregoing, Buyer shall make available its employees to give depositions or testimony and shall furnish all documentary or other evidence that Seller may reasonably request, subject to reimbursement of Buyer's reasonable out-of-pocket costs incurred in complying with Seller's request.

5.11   FCC Compliance.  If Closing occurs prior to receipt of a Final Order and after Closing the FCC Consent is reversed or otherwise set aside, and there is a final order of the FCC (or court of competent jurisdiction) requiring the re-assignment of the FCC Licenses to Seller, then the purchase and sale of the Station Assets shall be rescinded. In such event, Buyer shall reconvey to Seller the Station Assets free and clear of Liens other than Permitted Liens, and Seller shall repay to Buyer the Purchase Price and reassume the Station Contracts. Any such rescission shall be consummated on a mutually agreeable date within thirty days of such final order (or, if earlier, within the time required by such order). In connection therewith, Buyer and Seller shall each execute such documents (including execution by Buyer of instruments of conveyance of the Station Assets to Seller and execution by Seller of instruments of assumption of the Station Contracts) and make such payments (including repayment by Seller to Buyer of the Purchase Price) as are necessary to give effect to such rescission.

5.12   Additional Documents.  If Seller's moves of WSRW-FM out of Chillicothe, WTRZ-FM out of Sparta or WMRN-FM out of Marion are not complete by Closing, then at Closing, as appropriate depending on which of such moves may be complete, Buyer and Seller will enter into the following additional documents:

      (a)   a Local Programming and Marketing Agreement and a Shared Services Agreement with respect to WSRW-FM in the forms attached hereto as *Exhibit C*;

      (b)   a Local Programming and Marketing Agreement and a Shared Services Agreement with respect to WTRZ-FM in the forms attached hereto as *Exhibit D*; and

      (c)   a Local Programming and Marketing Agreement and a Shared Services Agreement with respect to WMRN-FM in the forms attached hereto as *Exhibit E*.

5.13   Title Insurance and Surveys.  With respect to each parcel of Owned Real Property, Buyer may, at its option and expense, undertake to obtain a title insurance policy in such form as shall be acceptable to Buyer, insuring title to such parcel to be in the name of Buyer as of the Closing, subject only to liens or encumbrances expressly permitted by this Agreement. With respect to each parcel of Owned Real Property, upon reasonable notice Seller shall provide reasonable access during normal business hours to permit Buyer to obtain a current survey of such parcel at Buyer's expense, provided that such access rights shall not be exercised in a manner that interferes with the operation of the Station using such parcel. No such title insurance policies or surveys are conditions to Closing.

## ARTICLE 6:   SELLER CLOSING CONDITIONS

The obligation of Seller to consummate the Closing hereunder is subject to satisfaction, at or prior to Closing, of each of the following conditions (unless waived in writing by Seller):

6.1   Representations and Covenants.

(a)    The representations and warranties of Buyer made in this Agreement, shall be true and correct in all material respects as of the Closing Date except for changes permitted or contemplated by the terms of this Agreement.

(b)    The covenants and agreements to be complied with and performed by Buyer at or prior to Closing shall have been complied with or performed in all material respects.

(c)    Seller shall have received a certificate dated as of the Closing Date from Buyer executed by an authorized officer of Buyer to the effect that the conditions set forth in Sections 6.1(a) and (b) have been satisfied.

6.2    Proceedings.  Neither Seller nor Buyer shall be subject to any court or governmental order or injunction restraining or prohibiting the consummation of the transactions contemplated hereby.

6.3    FCC Authorization.  The FCC Consent shall have become a Final Order.

6.4    Trust.  The conditions set forth in Section 1.11(iv) and (v) shall have been satisfied.

6.5    Hart Scott Rodino.  If applicable, the HSR Clearance shall have been obtained.

6.6    Deliveries.  Buyer shall have complied with its obligations set forth in Section 8.2.

## ARTICLE 7:  BUYER CLOSING CONDITIONS

The obligation of Buyer to consummate the Closing hereunder is subject to satisfaction, at or prior to Closing, of each of the following conditions (unless waived in writing by Buyer):

7.1    Representations and Covenants.

(a)    The representations and warranties of Seller made in this Agreement shall be true and correct in all material respects as of the Closing Date except for changes permitted or contemplated by the terms of this Agreement.

(b)    The covenants and agreements to be complied with and performed by Seller at or prior to Closing shall have been complied with or performed in all material respects.

(c)    Buyer shall have received a certificate dated as of the Closing Date from Seller executed by an authorized officer of Seller to the effect that the conditions set forth in Sections 7.1(a) and (b) have been satisfied.

7.2    Proceedings.  Neither Seller nor Buyer shall be subject to any court or governmental order or injunction restraining or prohibiting the consummation of the transactions contemplated hereby.

7.3    FCC Authorization.  The FCC Consent shall have become a Final Order.

- 21 -

7.4    Trust.  The conditions set forth in Section 1.11(iv) and (v) shall have been satisfied.

7.5    Hart Scott Rodino.  If applicable, the HSR Clearance shall have been obtained.

7.6    Deliveries.  Seller shall have complied with its obligations set forth in Section 8.1.

7.7    Consents.  The Required Consents shall have been obtained.

ARTICLE 8:    CLOSING DELIVERIES

8.1    Seller Documents.  At Closing, Seller shall deliver or cause to be delivered to Buyer:

(i)    good standing certificates issued by the Secretary of State of Seller's jurisdiction of formation;

(ii)    a certificate executed by Seller's secretary or assistant secretary evidencing authorization by Seller's board of directors for the execution, delivery and performance of this Agreement, including the consummation of the transactions contemplated hereby;

(iii)    the certificate described in Section 7.1(c);

(iv)    an assignment of FCC authorizations assigning the FCC Licenses from Seller to Buyer;

(v)    an assignment and assumption of contracts assigning the Station Contracts from Seller to Buyer;

(vi)    an assignment and assumption of leases assigning the Real Property Leases (if any) from Seller to Buyer;

(vii)    special warranty deeds conveying the Owned Real Property (if any) from Seller to Buyer;

(viii)    an assignment of marks assigning the Stations' registered marks listed on *Schedule 1.1(e)* (if any) from Seller to Buyer;

(ix)    domain name transfers assigning the Stations' domain names listed on *Schedule 1.1(e)* (if any) from Seller to Buyer following customary procedures of the domain name administrator;

(x)    endorsed vehicle titles conveying the vehicles included in the Tangible Personal Property (if any) from Seller to Buyer;

(xi)    a bill of sale conveying the other Station Assets from Seller to Buyer;

(xii)    the additional documents described in Section 5.12; and

- 22 -

(xiii)   any other instruments of conveyance, assignment and transfer that may be reasonably necessary to convey, transfer and assign the Station Assets from Seller to Buyer, free and clear of Liens, except for Permitted Liens.

8.2   <u>Buyer Documents</u>.  At Closing, Buyer shall deliver or cause to be delivered to Seller:

(i)   the Purchase Price in accordance with Section 1.5 hereof;

(ii)   good standing certificates issued by the Secretary of State of Buyer's jurisdiction of formation;

(iii)   certified copies of resolutions authorizing the execution, delivery and performance of this Agreement, including the consummation of the transactions contemplated hereby;

(iv)   the certificate described in Section 6.1(c);

(v)   an assignment and assumption of contracts assuming the Station Contracts;

(vi)   an assignment and assumption of leases assuming the Real Property Leases (if any);

(vii)   domain name transfers assuming the Stations' domain names listed on *Schedule 1.1(e)* (if any) following customary procedures of the domain name administrator;

(viii)   any new agreements required by *Schedule 1.1(d)* or otherwise required by this Agreement;

(ix)   the additional documents described in Section 5.12; and

(x)   such other documents and instruments of assumption that may be necessary to assume the Assumed Obligations.

## ARTICLE 9:  SURVIVAL; INDEMNIFICATION

9.1   <u>Survival</u>.  The representations and warranties in this Agreement shall survive Closing for a period of twelve (12) months from the Closing Date whereupon they shall expire and be of no further force or effect, except (i) those under Section 2.5 (Taxes), Section 2.9 (Environmental), and those under Sections 2.6, 2.7 and 2.10 solely with respect to title, all of which shall survive until the expiration of any applicable statute of limitations, and (ii) that if within such twelve (12) month period the indemnified party gives the indemnifying party written notice of a claim for breach thereof describing in reasonable detail the nature and basis of such claim, then such claim shall survive until the earlier of resolution of such claim or expiration of the applicable statute of limitations.  The covenants and agreements in this Agreement shall survive Closing until performed.

9.2   <u>Indemnification</u>.

- 23 -

(a)    Subject to Section 9.2(b), from and after Closing, Seller shall defend, indemnify and hold harmless Buyer from and against any and all losses, costs, damages, liabilities and expenses, including reasonable attorneys' fees and expenses ("Damages") incurred by Buyer arising out of or resulting from:

(i)    any breach by Seller of its representations and warranties made under this Agreement; or

(ii)    any default by Seller of any covenant or agreement made under this Agreement; or

(iii)    the Retained Obligations; or

(iv)    the business or operation of the Stations before the Effective Time, except for the Assumed Obligations.

(b)    Notwithstanding the foregoing or anything else herein to the contrary, after Closing, (i) Seller shall have no liability to Buyer under clause (i) of Section 9.2(a) until Buyer's aggregate Damages exceed $500,000, after which such threshold amount shall be included, not excluded, from any calculation of Damages, and (ii) the maximum aggregate liability of Seller under clause (i) of Section 9.2(a) shall be an amount equal to 20% of the Purchase Price.

(c)    From and after Closing, Buyer shall defend, indemnify and hold harmless Seller from and against any and all Damages incurred by Seller arising out of or resulting from:

(i)    any breach by Buyer of its representations and warranties made under this Agreement; or

(ii)    any default by Buyer of any covenant or agreement made under this Agreement; or

(iii)    the Assumed Obligations; or

(iv)    the business or operation of the Stations after the Effective Time.

9.3    Procedures.

(a)    The indemnified party shall give prompt written notice to the indemnifying party of any claim by indemnified party regarding indemnifying party's breach of its representations and warranties or default of its covenants or agreements hereunder, or of any demand, suit, claim or assertion of liability by third parties that is subject to indemnification hereunder (a "Claim"), but a failure to give such notice or delaying such notice shall not affect the indemnified party's rights or the indemnifying party's obligations except to the extent the indemnifying party's ability to remedy, contest, defend or settle with respect to such Claim is thereby prejudiced and provided that such notice is given within the time period described in Section 9.1.

- 24 -

(b)     The indemnifying party shall have the right to undertake the defense or opposition to any third-party Claim with counsel selected by it.  In the event that the indemnifying party does not undertake such defense or opposition in a timely manner, the indemnified party may undertake the defense, opposition, compromise or settlement of such Claim with counsel selected by it at the indemnifying party's cost (subject to the right of the indemnifying party to assume defense of or opposition to such Claim at any time prior to settlement, compromise or final determination thereof).

(c)     Anything herein to the contrary notwithstanding:

(i)     the indemnified party shall have the right, at its own cost and expense, to participate in the defense, opposition, compromise or settlement of the Claim;

(ii)     the indemnifying party shall not, without the indemnified party's written consent, settle or compromise any Claim or consent to entry of any judgment which does not include the giving by the claimant to the indemnified party of a release from all liability in respect of such Claim;

(iii)     in the event that the indemnifying party undertakes defense of or opposition to any Claim, the indemnified party, by counsel or other representative of its own choosing and at its sole cost and expense, shall have the right to consult with the indemnifying party and its counsel concerning such Claim and the indemnifying party and the indemnified party and their respective counsel shall cooperate in good faith with respect to such Claim; and

(iv)     neither party shall have any liability to the other under any circumstances for special, indirect, consequential, punitive or exemplary damages or lost profits or similar damages of any kind, whether or not foreseeable.

## ARTICLE 10: TERMINATION AND REMEDIES

10.1     Termination.  Subject to Section 10.3, this Agreement may be terminated prior to Closing as follows:

(a)     by mutual written consent of Buyer and Seller;

(b)     by written notice of Buyer to Seller if Seller breaches its representations or warranties or defaults in the performance of its covenants contained in this Agreement and such breach or default is material in the context of the transactions contemplated hereby and is not cured within the Cure Period (defined below);

(c)     by written notice of Seller to Buyer if Buyer breaches its representations or warranties or defaults in the performance of its covenants contained in this Agreement and such breach or default is material in the context of the transactions contemplated hereby and is not cured within the Cure Period; provided, however, that the Cure Period shall not apply to Buyer's obligations to make the Deposit on the date hereof and to pay the Purchase Price at Closing;

(d)     by written notice of Seller to Buyer or Buyer to Seller if Closing does not occur by the date twelve (12) months after the date of this Agreement; or

- 25 -

      (e)     as provided by Section 5.5(c).

      10.2   <u>Cure Period</u>. Each party shall give the other party prompt written notice upon learning of any breach or default by the other party under this Agreement. The term "<u>Cure Period</u>" as used herein means a period commencing on the date Buyer or Seller receives from the other written notice of breach or default hereunder and continuing until the earlier of (i) twenty (20) calendar days thereafter or (ii) the Closing Date determined under Section 1.9; provided, however, that if the breach or default is non-monetary and cannot reasonably be cured within such period but can be cured before the Closing Date determined under Section 1.9, and if diligent efforts to cure promptly commence, then the Cure Period shall continue as long as such diligent efforts to cure continue, but not beyond the Closing Date determined under Section 1.9.

      10.3   <u>Survival</u>. Except as provided by Section 10.5, the termination of this Agreement shall not relieve any party of any liability for breach or default under this Agreement prior to the date of termination. Notwithstanding anything contained herein to the contrary, Sections 1.6 (Deposit) (and Section 10.5 with respect to the Deposit), 5.1 (Confidentiality) and 11.1 (Expenses) shall survive any termination of this Agreement.

      10.4   <u>Specific Performance</u>. In the event of failure or threatened failure by either party to comply with the terms of this Agreement, the other party shall be entitled to an injunction restraining such failure or threatened failure and, subject to obtaining any necessary FCC consent, to enforcement of this Agreement by a decree of specific performance requiring compliance with this Agreement. Notwithstanding the foregoing, if prior to Closing the condition described in Section 10.1(c) exists, then Seller's sole remedy shall be termination of this Agreement and receipt of the liquidated damages amount pursuant to Section 10.5, except for any noncompliance by Buyer with its obligations related to the Deposit or Sections 1.10, 5.1, 5.2 or 5.3, as to which noncompliance Seller shall be entitled to all available rights and remedies, including without limitation specific performance.

      10.5   <u>Liquidated Damages</u>. Except as set forth on *Schedule 10.5*, if Seller terminates this Agreement pursuant to Section 10.1(c), then the Deposit shall be immediately disbursed to Seller. Disbursement of the Deposit to Seller shall constitute liquidated damages and the sole remedy of Seller under this Agreement. Buyer acknowledges and agrees that Seller's recovery of such amount shall constitute payment of liquidated damages and not a penalty and that Seller's liquidated damages amount is reasonable in light of the substantial but indeterminate harm anticipated to be caused by Buyer's material breach or default under this Agreement, the difficulty of proof of loss and damages, the inconvenience and non-feasibility of otherwise obtaining an adequate remedy, and the value of the transactions to be consummated hereunder.

ARTICLE 11: <u>MISCELLANEOUS</u>

      11.1   <u>Expenses</u>. Each party shall be solely responsible for all costs and expenses incurred by it in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement. All governmental fees and charges applicable to any requests for Governmental Consents shall be shared equally. Buyer and Seller shall each be responsible for one-half of all governmental taxes, fees and charges applicable to the transfer of the Station Assets under this Agreement. Each party is responsible for any commission, brokerage fee, advisory fee or other similar payment that arises as a result of any agreement or action of it or

any party acting on its behalf in connection with this Agreement or the transactions contemplated hereby.

     11.2   Further Assurances.  After Closing, each party shall from time to time, at the request of and without further cost or expense to the other, execute and deliver such other instruments of conveyance and assumption and take such other actions as may reasonably be requested in order to more effectively consummate the transactions contemplated hereby.

     11.3   Assignment.  Except as provided by Section 5.9 (1031 Exchange) and Section 1.10(d), neither party may assign this Agreement without the prior written consent of the other party hereto, provided, however, that Buyer may assign its rights hereunder to an affiliate of Buyer upon written notice to, but without consent of, Seller, provided that (i) any such assignment does not delay processing of the FCC Application, grant of the FCC Consent or Closing, (ii) any such assignee delivers to Seller a written assumption of this Agreement, (iii) Buyer shall remain liable for all of its obligations hereunder, and (iv) Buyer shall be solely responsible for any third party consents necessary in connection therewith (none of which are a condition to Closing). The terms of this Agreement shall bind and inure to the benefit of the parties' respective successors and any permitted assigns, and no assignment shall relieve any party of any obligation or liability under this Agreement. Notwithstanding the foregoing, at Closing, Buyer may collaterally assign any or all of its rights under this Agreement to its senior lenders upon written notice to Seller, provided that no actual assignment shall be effective unless and until the assignee assumes this Agreement in a writing delivered to Seller and no collateral or actual assignment shall relieve Buyer of any of its obligations hereunder.

     11.4   Notices.  Any notice pursuant to this Agreement shall be in writing and shall be deemed delivered on the date of personal delivery or confirmed facsimile transmission or confirmed delivery by a nationally recognized overnight courier service, and shall be addressed as follows (or to such other address as any party may request by written notice):

| | |
|---|---|
| if to Seller: | Clear Channel Broadcasting, Inc.<br>200 E. Basse Road<br>San Antonio, TX 78209<br>Attention: Jerry Kersting<br>Facsimile: (210) 822-2299 |
| with a copy (which shall not constitute notice) to: | Clear Channel Broadcasting, Inc.<br>Legal Department<br>200 E. Basse Road<br>San Antonio, TX 78209<br>Attention: Christopher M. Cain, Esq.<br>Facsimile: (210) 832-3433 |
| and to: | Wiley Rein LLP<br>1776 K Street, N.W.<br>Washington, D.C. 20006<br>Attention: Doc Bodensteiner, Esq.<br>Facsimile: (202) 719-7049 |

- 27 -

| | |
|---|---|
| if to Buyer: | GoodRadio.TV, LLC<br>c/o American Securities Capital Partners, LLC<br>666 Third Avenue, 29th Floor<br>New York, NY 10017<br>Attention: Eric L. Schondorf, Esq.<br>Facsimile: (212) 679-5524 |
| with copies (which shall not constitute notice) to: | GoodRadio.TV, LLC<br>5052 Dorsey Hall Drive<br>Suite 202<br>Ellicott City, Maryland 21042<br>Attention: Dean Goodman, CEO |
| and to: | Dow Lohnes PLLC<br>1200 New Hampshire Avenue, NW<br>Washington, D.C. 20036<br>Attention: Michael D. Basile, Esq.<br>Facsimile: (202) 776-2222 |
| and to: | Cravath, Swain & Moore LLP<br>Worldwide Plaza<br>825 Eight Avenue<br>New York, NY 10019<br>Attention: Ronald Cami, Esq.<br>Facsimile: (212) 474-1048 |

11.5    Amendments.  No amendment or waiver of compliance with any provision hereof or consent pursuant to this Agreement shall be effective unless evidenced by an instrument in writing signed by the party against whom enforcement of such amendment, waiver, or consent is sought.

11.6    Entire Agreement.  This Agreement (including the Schedules hereto) constitutes the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings with respect to the subject matter hereof, except any confidentiality agreement among the parties with respect to the Stations, which shall remain in full force and effect.  No party makes any representation or warranty with respect to the transactions contemplated by this Agreement except as expressly set forth in this Agreement.  Without limiting the generality of the foregoing, Seller makes no representation or warranty to Buyer with respect to any projections, budgets or other estimates of the Stations' revenues, expenses or results of operations, or, except as expressly set forth in Article 2, any other financial or other information made available to Buyer with respect to the Stations.

11.7    Severability.  If any court or governmental authority holds any provision in this Agreement invalid, illegal or unenforceable under any applicable law, then, so long as no party is deprived of the benefits of this Agreement in any material respect, this Agreement shall be construed with the invalid, illegal or unenforceable provision deleted and the validity, legality

- 28 -

and enforceability of the remaining provisions contained herein shall not be affected or impaired thereby.

11.8    No Beneficiaries.  Nothing in this Agreement expressed or implied is intended or shall be construed to give any rights to any person or entity other than the parties hereto and their successors and permitted assigns.

11.9    Governing Law.  The construction and performance of this Agreement shall be governed by the laws of the State of Texas without giving effect to the choice of law provisions thereof.

11.10    Counterparts.  This Agreement may be executed in separate counterparts, each of which will be deemed an original and all of which together will constitute one and the same agreement.

Dated as of:  April 30, 2007

[SIGNATURE PAGE FOLLOWS]

12642268

## SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**BUYER:**                GOODRADIO.TV, LLC

By: _Paul Hayes_ _____
Name: PaulKasper
Title:

**SELLER:**               CLEAR CHANNEL BROADCASTING, INC.
CLEAR CHANNEL BROADCASTING LICENSES, INC.
CC LICENSES, LLC
CAPSTAR RADIO OPERATING COMPANY
CAPSTAR TX LIMITED PARTNERSHIP
AMFM RADIO LICENSES, LLC
CITICASTERS CO.
CITICASTERS LICENSES, L.P.
JACOR BROADCASTING CORPORATION

By: _____
Name:
Title:

## SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

BUYER:                          GOODRADIO.TV, LLC

                                By: _____
                                    Name:
                                    Title:

SELLER:                         CLEAR CHANNEL BROADCASTING, INC.
                                CLEAR CHANNEL BROADCASTING LICENSES, INC.
                                CC LICENSES, LLC
                                CAPSTAR RADIO OPERATING COMPANY
                                CAPSTAR TX LIMITED PARTNERSHIP
                                AMFM RADIO LICENSES, LLC
                                CITICASTERS CO.
                                CITICASTERS LICENSES, L.P.
                                JACOR BROADCASTING CORPORATION

                                By: _____
                                    Name:   JOHN T. TIPPIT
                                    Title:  Senior Vice President

## EXHIBIT A

*Anchorage, AK:*

KASH-FM, Anchorage, Alaska          KGOT(FM), Anchorage, Alaska
KBFX(FM), Anchorage, Alaska         KTZN(AM), Anchorage, Alaska
KENI(AM), Anchorage, Alaska         KYMG(FM), Anchorage, Alaska

*Augusta, ME:*

WABK-FM, Gardiner, Maine            WMCM(FM), Rockland, Maine
WCME(FM), Boothbay Harbor, Maine    WQSS(FM), Camden, Maine
WFAU(AM), Gardiner, Maine           WRKD(AM), Rockland, Maine
WIGY(FM), Madison, Maine            WTOS-FM, Skowhegan, Maine
WKCG(FM), Augusta, Maine

*Bangor, ME:*

WABI(AM), Bangor, Maine             WKSQ(FM), Ellsworth, Maine
WBFB(FM), Belfast, Maine            WLKE(FM), Bar Harbor, Maine
WFZX(FM), Searsport, Maine          WVOM(FM), Howland, Maine
WGUY(FM), Dexter, Maine             WWBX(FM), Bangor, Maine

*Binghamton, NY:*

WBBI(FM), Endwell, NY               WKGB-FM, Conklin, NY
WENE(AM), Endicott, NY              WMRV-FM, Endicott, NY
WINR(AM), Binghamton, NY            WMXW(FM), Vestal, NY

*Bismarck, ND:*

KBMR(AM), Bismarck, ND              KSSS(FM), Bismarck, ND
KFYR(AM), Bismarck, ND              KXMR(AM), Bismarck, ND
KQDY(FM), Bismarck, ND              KYYY(FM), Bismarck, ND

*Burlington, VT:*

WCPV(FM), Essex, New York           WEZF(FM), Burlington, Vermont
WEAV(AM), Plattsburgh, New York     WVTK(FM), Port Henry, New York
WXZO(FM), Willsboro, New York

*Chillicothe, OH:*

WBEX(AM), Chillicothe, Ohio         WCHO-FM, Washington Court House,
                                    Ohio

WCHI(AM), Chillicothe, Ohio
WCHO(AM), Washington Court House,
Ohio

WKKJ(FM), Chillicothe, Ohio
WSRW(AM), Hillsboro, Ohio

*Cookeville, TN:*

WHUB(AM), Cookeville, Tennessee
WGIC(FM), Cookeville, Tennessee

WGSQ(FM), Cookeville, Tennessee

WPTN(AM), Cookeville, Tennessee
Cable Channel WHUB, Cookeville,
Tennessee

*Eau Claire, WI:*

WATQ(FM), Chetek, Wisconsin
WBIZ(AM), Eau Claire, Wisconsin
WBIZ-FM, Eau Claire, Wisconsin
WISM-FM, Altoona, Wisconsin

WMEQ(AM), Menomonie, Wisconsin
WMEQ-FM, Menomonie, Wisconsin
WQRB(FM), Bloomer, Wisconsin

*Fairbanks, AK:*

KAKQ-FM, Fairbanks, Alaska
KFBX(AM), Fairbanks, Alaska

KIAK-FM, Fairbanks, Alaska
KKED(FM), Fairbanks, Alaska

*Farmington, NM:*

KAZX(FM), Kirtland, New Mexico
KCQL(AM), Aztec, New Mexico
KDAG(FM), Farmington, New Mexico

KKFG(FM), Bloomfield, New Mexico
KTRA-FM, Farmington, New Mexico

*Fayetteville, AR:*

KEZA(FM), Fayetteville, Arkansas
KIGL(FM), Seligman, Missouri

KKIX(FM), Fayetteville, Arkansas
KMXF(FM), Lowell, Arkansas

*Findlay/Tiffin, OH:*

WCKY-FM, Tiffin, Ohio
WPFX-FM, North Baltimore, Ohio

WTTF(AM), Tiffin, Ohio

*Fort Smith, AR:*

KWHN(AM), Fort Smith, AR
KMAG(FM), Fort Smith, AR
KZBB(FM), Poteau, OK

KKBD(FM), Sallisaw, OK
KYHN(AM), Fort Smith, AR

*Gadsden, AL:*

WAAX(AM), Gadsden, AL                    WGMZ(FM), Glencoe, AL

*Gallup, NM:*

KFMQ(FM), Gallup, New Mexico             KGLX(FM), Gallup, New Mexico
KFXR-FM, Chinle, Arizona                 KXTC(FM), Thoreau, Mexico

*Huntington, WV:*

WAMX(FM), Milton, West Virginia          WTCR-FM, Huntington, West Virginia
WBKS(FM), Ironton, Ohio                  WVHU(AM), Huntington, West Virginia
WBVB(FM), Coal Grove, Ohio               WIRO(AM), Ironton, Ohio
WKEE-FM, Huntington, West Virginia       WZZW(AM), Milton, West Virginia
WTCR(AM), Kenova, West Virginia

*Lancaster, PA:*

WLAN(AM), Lancaster, Pennsylvania        WLAN-FM, MHz, Lancaster,
                                         Pennsylvania

*Laurel/Hattiesburg, MS:*

WEEZ(AM), Laurel, Mississippi            WNSL(FM), Laurel, Mississippi
WFOR(AM), Hattiesburg, Mississippi       WUSW(FM), Hattiesburg, Mississippi
WHER(AM), Heidelberg, Mississippi        WZLD(FM), Petal, Mississippi
WJKX(FM), Ellisville, Mississippi

*Lima, OH:*

WBUK(FM), Ottawa, Ohio                   WLWD(FM), Columbus Grove, Ohio
WIMA(AM), Lima Ohio                      WMLX(FM), St. Marys, Ohio
WIMT(FM), Lima, Ohio                     WZRX-FM, Fort Shawnee, Ohio

*Marion, OH:*

WDIF(FM), Marion, Ohio                   WYNT(FM), Caledonia, Ohio
WMRN(AM), Marion, Ohio

*Minot, ND:*

KCJB(AM), Minot, North Dakota            KRRZ(AM), Minot, North Dakota
KIZZ(FM), Minot, North Dakota            KYYX(FM), Minot North Dakota
KMXA-FM, Minot North Dakota              KZPR(FM), Minot, North Dakota

*Montgomery, AL:*

WHLW(FM), Luverne, AL                    WZHT(FM), Troy, AL
WWMG(FM), Millbrook, AL

*Ogallala, NE:*

KOGA(AM), Ogallala, Nebraska            KMCX-FM, Ogallala, Nebraska
KOGA-FM, Ogallala, Nebraska

*Parkersburg, WV:*

WDMX(FM), Vienna, West Virginia         WNUS(FM), Belpre, Ohio
WHNK(AM), Parkersburg, West Virginia    WRVB(FM), Marietta, Ohio
WLTP(AM), Marietta, Ohio

*Poughkeepsie, NY:*

WBWZ (FM), New Paltz, New York          WPKF(FM), Poughkeepsie, New York
WCTW (FM), Catskill, New York           WRNQ(FM), Poughkeepsie, New York
WRWC (FM), Ellenville, New York         WELG(AM), Ellenville, New York
WHUC(AM), Hudson, New York              WRWD-FM, Highland, New York
WKIP(AM), Poughkeepsie, New York        WZCR(FM), Hudson, New York

*Randolph, VT:*

WCVR-FM, Randolph, Vermont              WTSJ(AM), Randolph, Vermont

*Reading, PA:*

WKAP(AM), Reading, Pennsylvania         WRFY-FM, Reading, Pennsylvania

*Rochester, MN:*

KMFX(AM), Wabasha, Minnesota            KRCH(FM), Rochester, Minnesota
KMFX-FM, Lake City, Minnesota           KWEB(AM), Rochester, Minnesota
KNFX(AM), Austin, Minnesota

*Salisbury, MD:*

WDKZ(FM), Salisbury, Maryland           WQHQ(FM), Ocean City-Salisbury,
                                        Maryland
WLBW(FM), Fenwick Island, Delaware      WSBY-FM, Salisbury, Maryland

WJDY(AM), Salisbury, Maryland          WTGM(AM), Salisbury, Maryland
WOSC(FM), Bethany Beach, Delaware      WWFG(FM), Ocean City, Maryland

*Sandusky, OH:*

WCPZ(FM), Sandusky, Ohio               WMJK(FM), Clyde, Ohio
WLEC(AM), Sandusky, Ohio

*Sioux City, IA:*

KGLI(FM), Sioux City, Iowa             KSFT-FM, South Sioux City, Nebraska
KMNS(AM), Sioux City, Iowa             KWSL(AM), Sioux City, Iowa
KSEZ(FM), Sioux, City, Iowa

*Somerset, KY:*

WKEQ(FM), Somerset, Kentucky           WSFC(AM), Somerset, Kentucky
WLLK-FM, Somerset, Kentucky            WSFE(AM), Burnside, Kentucky
WSEK(FM), Burnside, Kentucky

*Sparta-McMinnville, TN:*

WAKI(AM), McMinnville, Tennessee       WRKK-FM, Sparta, Tennessee
WBMC(AM), McMinnville, Tennessee       WSMT(AM), Sparta, Tennessee
WKZP(FM), Spencer, Tennessee           WTZX(AM), Sparta, Tennessee

*Wheeling, WV:*

WBBD(AM), Wheeling, West Virginia      WOVK(FM), Wheeling, West Virginia
WEGW(FM), Wheeling, West Virginia      WVKF(FM), Shadyside, Ohio
WKWK-FM, Wheeling, West Virginia       WWVA(AM), Wheeling, West Virginia

*Williamsport, PA:*

WBYL(FM), Salladasburg, Pennsylvania   WVRT(FM), Mill Hall, Pennsylvania
WBLJ-FM, Shamokin, Pennsylvania        WVRZ(FM), Mount Carmel, Pennsylvania
WRAK(AM), Williamsport, Pennsylvania   WKSB(FM), Williamsport, Pennsylvania
WRKK(AM), Hughesville, Pennsylvania

**EXHIBIT B**

None

**Schedule 4.1**
**Contracts**

Seller may enter into an agreement for Voice of the Southwest Agriculture ("VSA") network programming for any Station provided that it is terminable on 90 days or less notice without penalty. If requested by Buyer, which request may be made at any time on or after the date of the Agreement, Seller will refrain from entering into any new VSA agreement for the Stations and will promptly give notice of termination of any or all such contracts, whether now existing or signed after the date of the Agreement. Unless and until terminated, each such contract is a Station Contract and shall not be taken into account in calculating amounts under Section 4.1(h).

**Schedule 5.5**
**Environmental**

Environmental amount:        $3,250,000

# EXHIBIT B

<u>ASSIGNMENT AND ASSUMPTION AGREEMENT RE FCC LICENSES</u>

This ASSIGNMENT AND ASSUMPTION AGREEMENT RE FCC LICENSES is dated May 11, 2007, by and between GOODRADIO.TV, LLC, a Delaware limited liability company ("<u>Assignor</u>") and GOODRADIO.TV LICENSE, LLC, a Delaware limited liability company ("<u>Assignee</u>").

<u>R E C I T A L S :</u>

A.    Assignor and Clear Channel Broadcasting, Inc., Clear Channel Broadcasting Licenses, Inc., CC Licenses, LLC, Capstar Radio Operating Company, Capstar TX Limited Partnership, AMFM Radio Licenses, LLC, Citicasters Co., Citicasters Licenses, L.P. and Jacor Broadcasting Corporation (collectively, "<u>Seller</u>") have executed an Asset Purchase Agreement dated April 30, 2007 (the "<u>Purchase Agreement</u>"), pursuant to which Assignor has agreed to purchase and acquire from Seller all of its rights, title and interest in and to substantially all of the assets and properties of Seller, real and personal, tangible and intangible, that are used or held for use in the operation of the Stations that are listed on *Exhibit A* to the Purchase Agreement (the "<u>Station Assets</u>"), all on the terms and conditions set forth in the Purchase Agreement and the supporting schedules thereto.

B.    Assignee is a wholly owned subsidiary of Assignor.

C.    With any capitalized term not defined herein having the meaning given to such term in the Purchase Agreement, Assignor has agreed to assign, and Assignee has agreed to assume, Buyer's rights and obligations under the terms of the Purchase Agreement with respect to the FCC Licenses included in the Station Assets to be conveyed by Seller to Buyer thereunder.

<u>A G R E E M E N T S :</u>

In consideration of the above recitals and the covenants and agreements contained herein, Assignor and Assignee agree as follows:

1.    <u>Assignment</u>.  Pursuant to the terms of Section 11.3 of the Purchase Agreement, Assignor does hereby assign and transfer to Assignee all of the rights of Assignor as Buyer under the Purchase Agreement with respect to the FCC Licenses to be acquired by Buyer pursuant to the terms thereof.

2.    <u>Assumption</u>.  Assignee does hereby assume and agree to pay, discharge and perform all the obligations and liabilities of Assignor as Buyer under the Purchase Agreement to the extent such obligations and liabilities pertain to the FCC Licenses pursuant to the terms thereof.  Assignee specifically agrees to perform the covenants and fulfill the obligations of Buyer set forth in Sections 1.10 and 1.11 of the Purchase Agreement to the extent such covenants and obligations pertain to the FCC Licenses, to undertake to satisfy the conditions to Closing set forth in Article 6 and Section 8.2 of the Purchase Agreement to the extent such conditions pertain to the FCC Licenses or to Assignee as Buyer thereof, and to assume all other obligations, and be bound as Buyer, with respect to the purchase of the FCC Licenses pursuant

to the terms of the Purchase Agreement, including the obligations set forth in Article 9 of the Purchase Agreement.

     3.   <u>Confirmation of Continuing Liability</u>.  Assignor confirms (i) that the foregoing assignment and assumption shall not act as a novation, and (ii) that Assignor shall not be released from, and shall remain fully liable for, all of Buyer's obligations and liabilities pursuant to the terms of the Purchase Agreement.

     4.   <u>Further Assurances</u>.  Assignor and Assignee shall each do, execute and deliver all such further acts and instruments that are appropriate and commercially reasonable that may be requested by the other in order to more fully effectuate Assignor's assignment of its rights under the Purchase Agreement with respect to the FCC Licenses, and Assignee's assumption of Assignor's obligations or liabilities with respect thereto as set forth herein, subject to the terms of the Purchase Agreement.

     IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment and Assumption Agreement re FCC Licenses as of the date first above written.

ASSIGNOR:

GOODRADIO.TV, LLC

By: _____
    Paul Kasper, Vice President

ASSIGNEE:

GOODRADIO.TV LICENSE, LLC

By: _____
    Paul Kasper, Vice President

- 2 -

# EXHIBIT C

RADIO ONLINE ®

Account Login
Contact/Info
My Account
*Subscribe Now*
Main Menu
News & Headlines
Show Prep
Promotions
Ratings/Trends
Airchecks Library
Radio Databases
Job Opportunities
Radio Links
Quick Snaps
Daily Show Prep
PrepNet
Recorded Bits
Prep Almanac
Best Bits & Stunts
Movie/TV Clips
Promo Monitor
Promotions Link
Promo Spotlight



# Daily News & Headlines

Menu | Headlines | Top Stories | Changes | Business | Stocks



### GoodRadio.TV Becomes Frequency License, Goodman Exits

Earlier this week RADIO ONLINE reported that GoodRadio.TV would change its name following the exit of CEO Dan Goodman. Today comes word that the company has amended its transfer applications with the FCC to reflect a new name of Frequency License LLC. It also noted that there were no changes to the "ultimate ownership or control" of the buyer, which continues to be Michael Fisch.

Frequency License's financial backer also continues to be American Securities Capital Partners. Goodman exits and retains the GoodRadio.TV name for his 22 outlets in Iowa and Missouri and future acquisitions, while the recently 187 acquired Clear Channel divestures in 36 markets will be placed under Frequency License. (07-20-07)



15 Issues

Copyright © 1989-2007 RADIO ONLINE ®
The publisher makes no claims concerning the validity of the information posted on RADIO ONLINE and will not be held liable for its use. No part of this material may be reproduced in any form, incorporated in any information retrieval system or otherwise redistributed without the prior written permission of the publisher.

GO RADIO ONLINE

○ AM ● FM ○ ROL

LATEST RATINGS
Spring 2007 Quarterly
Albuquerque NM
Asheville NC
Charleston SC
Des Moines IA
Eau Claire WI
El Paso TX
Florence AL
Fort Wayne IN
Hot Springs AR
Jackson MS

SITE OF THE DAY



NEW AIRCHECKS
Scott & Todd
Super Snake
Steve Cassanova
Rick & Bubba
Jeff Walker
Xavier: Da
Freakin' Rican
Romeo
Stevey Harvey
Wendy Williams
Karen & Christine
Jack Kratoville
Camelback Jack
Jim Kerr
Hollywood &
Goumba
Race Taylor

# EXHIBIT D

Is Connoisseur's Warshaw Making His Investors Nervous? » Erie Media-Go-Round

# Erie Media-Go-Round

**Jack Tirak's Very Candid Views and News About Erie Media**

- Home
- About

## Is Connoisseur's Warshaw Making His Investors Nervous?

25 Jul, 2007  Editor's Scribbles

"Connoisseur backers may feel that his attention's being divided."

Editor's
Scribbles

The trade papers have been recently filled with several items about Connoisseur mogul Jeff Warshaw consulting on the purchase of about 190 stations from Clear Channel for American Securities Capital



Partners.

According to the blog Taylor On Radio-Info   by Jim Taylor, the interest has turned from just consulting for American Securities to actually managing all 190 stations they plan to buy.

> Main thing is, Warshaw may still have some issues, such as working things out with the investors in his current Connoisseur group. They backed this Connoisseur II because of Jeff and his experience, and their belief that he'd be there to supervise the growth of their stations. Now…he's itching for the challenge of running nearly 190 stations that American Securities wants to buy from Clear Channel, and then possibly contribute the Connoisseur properties into that. Either way, the Connoisseur backers may feel that his attention's being divided.

If the future is like the past, Warshaw has proven he is very loyal to those that have been with him over two different incarnations of Connoisseur. One such ally is Dave Bevins who currently manages the Connoisseur Erie properties.

Tayor, in his piece, also talks about Warshaw's loyalty to his trusted team.

> In the air: could some of Jeff Warshaw's former associates join him?
> It's happened before, as Jeff reconstituted Connoisseur and proudly welcomed back a number of guys who'd been with him at Connoisseur I. Now I'm hearing that could be

# EXHIBIT 2

# CONFIDENTIALITY AGREEMENT

## November 30, 2006

DeanRadio.TV Inc.
525 S Flagler Dr.
W Palm Beach, Fl 33401
(561) 832-7972
Dean@DeanRadio.TV
Attention: Dean Goodman

Ladies and Gentlemen:

We understand that you may be interested in pursuing a mutually agreed upon transaction (the "*Transaction*") with Clear Channel Communications, Inc. (the "*Company*"). In connection with your interest in a possible Transaction with the Company, the Company and its advisors and agents are prepared to make available to you and your Representatives (as defined below) certain information which is non-public, confidential and/or proprietary in nature (the "*Confidential Information*"). In consideration of our furnishing you with the Confidential Information, and as a condition to such disclosure, you agree as follows:

1    Except as provided herein, you will keep the Confidential Information confidential and will not disclose the Confidential Information to anyone except to your Representatives under the terms and conditions referred to in this letter agreement (the "*Agreement*").

2.   You recognize and acknowledge the competitive value and confidential nature of the Confidential Information and the damage that could result to the Company if any information contained therein is disclosed to a third party. The Confidential Information will be used by you solely for the purpose of analyzing and evaluating the desirability of entering into the Transaction and for no other purpose. You will permit your employees, affiliates, officers, directors, partners, members, managers, agents, advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), potential financing sources, co-investors or representatives (collectively, your "*Representatives*") access to the Confidential Information only to the extent necessary to allow them to assist you in such analysis or evaluation. Prior to granting your Representatives access to the Confidential Information, you will (i) inform them of its confidential nature and of the terms of this Agreement, and (ii) to the extent it is an outside party (including, but not limited to, your affiliates in the business of owning or operating terrestrial or satellite radio or television broadcast stations), you will get permission from the Company in advance. You agree to be responsible for any breach of this Agreement by any of your Representatives. You further agree to indemnify and hold harmless the Company and its employees, affiliates, officers, directors, agents, advisors and representatives (collectively, "*Company Representatives*") from any damage, loss or expense incurred as a result of the use of Confidential Information by you or your Representatives contrary to the terms of this Agreement.

3.     The parties agree that unless required by applicable law or regulation (in which case you
       will as promptly as practicable advise and consult with the Company and its counsel prior
       to such disclosure), without the prior written consent of the Company and approval of the
       contents thereof, you will not, and will cause your Representatives not to, disclose to any
       person (a) the fact that discussions or negotiations are taking place concerning a possible
       Transaction, (b) any of the terms, conditions or other facts with respect to such
       Transaction, including the status thereof, or (c) the existence of this Agreement, the terms
       hereof or that Confidential Information has been made available pursuant to this
       Agreement.

4      Confidential Information includes (a) information transferred or transmitted in writing,
       orally, visually, electronically or by any other means, by the Company or any Company
       Representative on or after the date hereof, and (b) those portions of any memoranda,
       reports, analyses, extracts or notes you or your Representatives produce that are based on,
       reflect or contain any of the Confidential Information (the items referred to in this
       clause (b) collectively referred to as "*Notes*").  Confidential Information does not include
       any information that (i) becomes available to the public other than as a result of a
       disclosure by you or any of your Representatives in violation of this Agreement, (ii) was
       in your possession prior to the disclosure of the Confidential Information pursuant to this
       Agreement, provided that you did not know, or have reason to believe, after reasonable
       inquiry, that such source was subject to an obligation not to disclose such information,
       and/or (iii) becomes available to you or your Representatives on a non-confidential basis
       from a source other than the Company or any of its Representatives, provided that you
       did not know, or have reason to believe, after reasonable inquiry, that such source was
       subject to an obligation not to disclose such information.

5.     If you or your Representatives are requested to disclose any Confidential Information
       (including, but not limited to, any Notes) in connection with any legal or administrative
       proceeding or investigation, you will notify the Company as promptly as practicable of
       the existence, terms and circumstances surrounding such a request so that the Company
       may, in its sole discretion and at its sole expense, seek a protective order or other
       appropriate remedy and/or take steps to resist or narrow the scope of the disclosure
       sought by such request.  You agree to provide reasonable assistance to the Company at
       the Company's sole expense in seeking a protective order or other remedy, if requested
       by the Company.  If a protective order or other remedy is not obtained and, in the written
       opinion of your counsel, disclosure is required, you may make such disclosure without
       liability under this Agreement, provided that you or your Representatives furnish only
       that portion of the Confidential Information which is legally required to be disclosed, to
       the extent possible, you give the Company notice of the information to be disclosed as far
       in advance of its disclosure as practicable and you use your best efforts to ensure that
       confidential treatment will be accorded to all such disclosed information.
       Notwithstanding anything to the contrary in this Agreement, you are expressly authorized
       to disclose to any and all persons, without limitation of any kind, the tax treatment and
       tax structure of the Transaction and all materials of any kind (including opinions or other
       tax analyses) that are provided to you related to such tax treatment and tax structure;
       provided, however, that such disclosure may not be made until the earliest of (a) the date
       of the public announcement of discussions relating to the Transaction, (b) the date of

2

public announcement of the Transaction, or (c) the date of the execution of an agreement to enter into the Transaction.

6.      You acknowledge and agree that neither the Company nor any Company Representative nor any of its or their respective officers, directors, employees, agents or "controlling persons" (within the meaning of Section 20 of the Securities Exchange Act of 1934, as amended), (a) has made or makes any express or implied representation or warranty as to the accuracy or completeness of the Confidential Information, or (b) will have any liability whatsoever to you or any of your Representatives resulting from or relating to any use of the Confidential Information or any errors therein or omissions therefrom. You further agree that you are not entitled to rely on the accuracy or completeness of the Confidential Information, and that you will only be entitled to rely on such representations and warranties as may be included in any definitive agreement with respect to the Transaction, subject to such limitations and restrictions as may be contained therein.

7.      Upon the earliest to occur of (a) written notice from you to the Company at any time that you have decided not to proceed with the Transaction, or (b) written notice from the Company to you at any time that the Company has decided not to pursue the Transaction with you; you will, at the Company's election, either destroy or return to the Company (i) all documents and other materials (including without limitation all copies or reproductions of such documents or materials, tapes, floppy disks, backup copies, and other forms of electronic storage media) which constitute, contain or are derived from the Confidential Information, and (ii) all Notes connected with or arising out of your evaluation of the Transaction, and no copy thereof will be retained by you or your Representatives. You will deliver to the Company a certificate that you and your Representatives have complied with the requirements of this Paragraph 7. Notwithstanding the foregoing, you and your Representatives may retain one copy of the Confidential Information on a confidential basis, to the extent required to comply with legal or regulatory requirements; provided that those portions of the Confidential Information retained by you or your Representatives shall be subject to the confidentiality terms of this Agreement in perpetuity. Notwithstanding the return, deletion or destruction of the Confidential Information, you and your Representatives will continue to be bound by your obligations of confidentiality and other obligations under this Agreement.

8.      All inquiries for non-public information about the Company and its subsidiaries and communications with the Company will be made through Randall Mays. Neither you nor any of your Representatives will contact any third party with whom the Company or any of its subsidiaries has a business or other relationship (including without limitation any director, officer, employee, customer, supplier, stockholder or creditor of the Company or any of its subsidiaries) with regard to the possible Transaction without the Company's prior written consent.

9.      You agree that, without the prior written consent of the Company, for a period of two (2) years from the date of the Agreement, you and your affiliated entities will not solicit the employment of, hire or engage as a consultant, any person who was an employee of the

Company at any time during the ninety-day (90) period prior to his or her hire or engagement as an employee or consultant by you or your affiliates. The foregoing restriction shall not apply in the event you hire or engage as a consultant any person pursuant to a publicly disseminated job advertisement or posting or other recruiting effort not specifically directed at any employee of the Company.

10. Neither the Company nor you will be under any legal obligation with respect to a Transaction unless and until a definitive agreement between us is executed and delivered.

11. You acknowledge and agree that the Company would be damaged irreparably if any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached. Accordingly, the Company will be entitled to equitable relief, including, without limitation, an injunction or injunctions to prevent breaches of the provisions of this Agreement and to seek to enforce specifically this Agreement and its provisions in any action or proceeding instituted in any state or federal court located in the United States of America, in addition to any other remedy to which we may be entitled, at law or in equity. Except as expressly provided herein, the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations or remedies otherwise available at law or in equity. Except as expressly provided herein, nothing herein will be considered an election of remedies. In the event of litigation relating to this Agreement and upon final determination of a court of competent jurisdiction with respect thereto, the non-prevailing party in such litigation shall reimburse the prevailing party's reasonable costs and expenses (including reasonable attorney's fees) incurred in connection with such litigation.

12. Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transaction contemplated hereby may be brought in any state or federal court located in Bexar County, Texas, and you consent to the non-exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such action, suit or proceeding and irrevocably waive, to the fullest extent permitted by law, any objection that you may now or hereafter have to the laying of the venue of any such action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such action, suit or proceeding may be served on you anywhere in the world, whether within or outside the jurisdiction of any such court. Without limiting the foregoing, service of process on you at your address on the first page of this Agreement will be deemed effective service of process on you.

13. This Agreement will be governed by and construed in accordance with the laws of the State of Texas, without giving effect to any choice of law principles. This Agreement may not be amended or modified except by a writing signed by each of the parties

14. We may in our sole discretion (a) extend the time for the performance of any of your obligations under this Agreement, and/or (b) waive compliance with any of the agreements or conditions for our benefit contained herein. Any such extension or waiver will be valid only if set forth in a writing signed by us. No waiver by us of any default,

4

misrepresentation or breach hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay by either of us to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy

15.    The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided that if any provision of this Agreement, as applied to any party or to any circumstance, is judicially determined not to be enforceable in accordance with its terms, the parties agree that the court judicially making such determination may modify the provision in a manner consistent with its objectives such that it is enforceable, and/or delete specific words or phrases, and in its modified form, such provision will then be enforceable and will be enforced.

16.    You acknowledge that you are aware, and will inform your Representatives, that the securities laws of the United States (as well as stock exchange regulations) prohibit any person who has material, non-public information concerning the Company or its subsidiaries or a possible transaction involving the Company or its subsidiaries from purchasing or selling the Company's securities (or those of its subsidiaries) when in possession of such information and from communicating such information to any other person or entity under circumstances in which it is reasonably foreseeable that such person or entity is likely to purchase or sell such securities in reliance upon such information.

17.    Except as otherwise expressly set forth herein (including without limitation, the obligations with regards to retained Confidential Information set forth in Paragraph 7), the obligations of the parties under this Agreement will terminate three (3) years from the date hereof, whereupon this Agreement shall terminate and be of no further force or effect; provided, however, that from and after the closing of a definitive agreement relating to the Transaction, nothing herein will apply to or restrict your use of any Confidential Information that is included in the assets of the Company acquired by you pursuant to the terms of the definitive agreement (and regardless of whether such assets are acquired directly or indirectly by purchase, merger or otherwise).

18.    You agree that, other than in connection with the proposed Transaction, except as expressly provided in this Agreement, for a period of two (2) years from the date of this Agreement, unless such action shall have been specifically consented to in writing by the Company (it being understood that execution of this Agreement by the Company does not constitute such consent), neither you nor any Representative acting on your behalf will in any manner, including but not limited to entering into communications to or discussions with, the record or beneficial shareholders of the Company, directly or indirectly:

(a)     effect or seek, offer or propose (whether publicly or otherwise) to effect or seek, cause or in any way, assist any other person to effect or seek, or offer or propose (whether publicly or otherwise) to effect or seek, or otherwise participate in (i) any acquisition of 5% or more of the equity securities (or beneficial ownership thereof) or rights or options to acquire 5% or more of the equity securities (or beneficial ownership thereof) or a significant portion of the assets, indebtedness or businesses of the Company or any of its subsidiaries, (ii) any tender or exchange offer or merger or other business combination involving the Company or any of its subsidiaries, or assets of the Company or its subsidiaries constituting a significant portion of the consolidated assets of the Company and its subsidiaries, or (iii) any recapitalization, restructuring, liquidation, dissolution or other extraordinary transaction with respect to the Company or any of its subsidiaries,

(b)     make, or become a participant in, any "solicitation" of "proxies" (as such terms are defined in Regulation 14A promulgated by the Securities and Exchange Commission) or consents to vote any voting securities of the Company or any of its subsidiaries, or otherwise advise any person with respect to the voting of any voting securities of the Company or any of its subsidiaries,

(c)     form, join, become a member or in any way participate in a "group" (within the meaning of Rule 13d-5(b) under the Securities Exchange Act of 1934, as amended) with respect to the securities of the Company or any of its subsidiaries,

(d)     otherwise act, alone or in concert with others, to seek to control or influence the management, Board of Directors, shareholders, or policies of the Company or its subsidiaries, or take any action to prevent or challenge any transaction to which the Company or any of its subsidiaries is a party,

(e)     take any action, or make or permit your Representatives to take any action, which might force the Company or any of its subsidiaries to make a public announcement or other public disclosure regarding any of the types of matters set forth in (a), (b), (c), or (d) above, or

(f)     advise, assist, arrange, or otherwise enter into any discussions or arrangements with any third party with respect to any of the foregoing prohibited conduct

You also agree during such period not to request the Company (or any of its directors, officers, employees or other representatives), directly or indirectly, to amend or waive any provision of this Paragraph 18 (including this sentence)

19     This Agreement constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or between the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

20.   No party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other party, and any such assignment by a party without prior written approval of the other party will be deemed invalid and not binding on such other party.

21.   This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. This Agreement will become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, which delivery may be made by exchange of copies of the signature page by facsimile transmission.

*[SIGNATURE PAGE FOLLOWS]*

7

If you are in agreement with the foregoing, please sign and return the enclosed copy this letter which will constitute the Agreement with respect to the subject matter of this letter as of the date first above written.

Very truly yours,

Clear Channel Communications, Inc.

By: _Mark P. Mays_

Mark P. Mays
Chief Executive Officer

AGREED AND ACCEPTED:

DeanRadio.TV Inc
Dean Goodman_

_CEO and President

8